EXHIBIT 1



**Employment
Practices Group**

*Defining workplace rights*

May 29, 2015

*BY ELECTRONIC & U.S. MAIL*

<u>*CONFIDENTIAL COMMUNICATION*</u>

Peter Bennett
The Bennett Law Firm, P.A.
121 Middle Street, Suite 300
Portland, ME 04101

*Re:    Garrison Todd v. Aggregate Industries – Northeast Region, Inc.
         United States District Court for the District of New Hampshire,
         Civil Action # 1:14-cv-00393-JL*

Dear Mr. Bennett,

The Bennett Law Firm, P.A. retained me to examine file materials and offer expert opinion testimony in connection with Garrison Todd's lawsuit against Aggregate Industries – Northeast Region, Inc. ("the Company") in which Mr. Todd alleges wrongful termination. Issues addressed here include whether (1) the Company's decision to conduct an investigation which included surveillance of Mr. Todd, and (2) the Company's decision to terminate his employment reasonably complied with Company policies and were consistent with industry standards..

As discovery is ongoing, this report is preliminary in nature. As additional materials become available, such as deposition transcripts, I reserve the right and expect to supplement this report.

In the field of human resources and employment law, certain accepted industry standards are recognized in law or as "reasonable" or "best practices" for the handling of employer-employee issues in all aspects of human resources, including maintaining and enforcing policies, managing employees, responding to possible misconduct, conducting internal investigations, and making termination decisions. Sources relied on to form opinions about action employers should take when faced with such issues, and upon which I rely in forming my opinions, include the following: guidance and model policies promulgated by governmental agencies such as the Equal Employment Opportunity Commission ("EEOC") and state fair employment practices agencies; court decisions; legal analyses published in legal journals and discussed at continuing legal education courses and programs; books and treatises; and the sharing of practical approaches and strategies at professional conferences and continuing education courses for human resources professionals and employment attorneys. My own training, education and experience also enable me to espouse on principles of best practices and industry standards in the employment setting and form the opinions in this report, and I have published many papers and articles on investigations, terminations, and other related topics.

Professional organizations, as well, are a source for establishing and communicating the industry standard for employers. For example, the Society for Human Resources Management ("SHRM"), the world's largest professional association devoted to human resource management and an organization of which I am a member, is a key authority relied upon in articulating industry "best practices" for the handling of employer-employee issues in all aspects of human resources. Another noted authority relied upon for the articulation of such "best practices" is Business and Legal Resources ("BLR"), an acknowledged authority providing updated coverage of state and federal laws and industry standards on a variety of workplace matters.[1] BLR's business and legal resources are prepared by lawyers and industry experts for the business world so that organizations can have access to appropriate tools and resources for compliance. The Association of Workplace Investigators ("AWI") is a professional organization designed to promote and enhance workplace investigations, and is a resource for the proper conduct of investigations.[2]

My evaluation of the Company's decisions is based on whether the Company followed its own policies and best practices/industry standards in conducting its investigation and terminating Mr. Todd. I did not make any credibility determinations.

## I.   *SUMMARY OF OPINIONS*

In this report, I outline my opinions as follows:

    A.    The Company acted reasonably and in accordance with Company policy and best practices when it investigated Mr. Todd's injury and his compliance with medical orders.

        1.    The Company complied with Company policy when it investigated Mr. Todd's injury and his compliance with medical orders.

        2.    The Company conducted the investigation in accordance with best practices.

    B.    The Company acted reasonably and in accordance with company policy and best practices and when it terminated Mr. Todd's employment after surveillance revealed that Mr. Todd repeatedly failed to comply with medical orders, compromising his recovery and acting contrary to the Company's business interests.

        1.    The decision to terminate Mr. Todd's employment was justified and consistent with Company policy.

---

[1] I spoke at BLR's National Employment Law Update in November 2010, in Las Vegas, Nevada, and I have been quoted in BLR publications.

[2] I am a member of the Board of Directors and have been a speaker at AWI's annual conference, which is held in California in November each year. I was the 2012, 2013 and 2014 Annual Conference Chair.

    (a)    Mr. Todd's actions were contrary to clear medical orders.

    (b)    Company policies and training clearly communicate the expectation that employees will avoid dishonest, unethical or unsafe behaviors that could impact safety on the job.

    (c)    Mr. Todd's failure to heed medical orders was contrary to the Company's clearly communicated expectation that he would participate in managing behaviors that impact the Company's safety and legal compliance.

    2.    The Company complied with industry standards in conducting the termination.

## II.   *DOCUMENTS REVIEWED*

You provided me with a number of documents and information that I reviewed and analyzed in the course of this assignment, to include the following:

- Complaint

- Answer and Defenses

- Defendant's Responses and Objections to Plaintiff's First Set of Interrogatories and Requests for Production of Documents

- Defendant's First Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories and Requests for Production of Documents

- Defendant's Second Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories and Requests for Production of Documents

- Defendant's Responses and Objections to Plaintiff's Second Set of Interrogatories and Requests for Production of Documents

- Defendant's First Supplemental Responses and Objections to Plaintiff's Second Set of Interrogatories and Requests for Production of Documents

- Plaintiff's Responses to Defendant's First Set of Interrogatories and Request for Production of Documents

- May 22, 2013 SRC Investigation Report

- May 28, 2013 SRC Investigation Report

- Miscellaneous Company emails

- Termination letter

- NH workers' compensation medical forms

- Workers' compensation emails

- Safety Investigation Report

- SRC Video 5/16/13 and 5/18/13

- SRC Video 5/17/13, 5/20/13, 5/27/13

- Safety Video -- Aggregate Investigation

- Various email communications between Garrison Todd, Cary Williams, Allister Melvin, Justin Kratochvil, SRC Investigations, Rick Winter, Tammie Pierce, Jeff Ciampa, Patricia Autenrieth, and Kellie O'Halloran between May 20 and June 13, 2013

- Documents from Defendant's initial disclosure, including personnel file

- Worker's compensation file including certain Department of Labor documents

- Medical records from May 20 and May 29 cited in Defendant's Supplemental Response, #7C

- Additional medical records from May 7 and May 13

- Training attendance records from March 16, 2013

- PowerPoint training entitled "OH&S 2013 Aggregate Industries Safety Start-up"

- PowerPoint presentation entitled "Safety Working On and Around Machinery"

- Aggregate Industries' policy entitled "Safety Recognition, Rewards and Consequences Policy"

- Employee Handbook revised November 2009

4

- Acknowledgement of Receipt and Understanding for Code of Ethics Training signed by Garrison Todd on August 18, 2005

- Compliance Training Acknowledgment attendance sheet for May 30, 2012

- PowerPoint training for 2012 Compliance Training Quality Control, May 31, 2012

- Email communications from November 26-27, 2013 regarding request for reinstatement

- Personnel file of Garrison Todd

- Aggregate Industries Health & Safety Manual, revised 2004

- Job description for Tech QC II

- Affidavit of Allister Melvin dated May 22, 2015

- Aggregate Industries Code of Ethics, versions AI.08.001.v6 (January 1, 2012) and AI.08.001.v7 (January 1, 2013)

## III.   *BACKGROUND FACTS*

The facts below were derived from the Complaint and Answer and Defenses filed in this matter, unless otherwise noted.  Reference was made in the Complaint about Mr. Todd's receipt of unemployment compensation benefits from the State of New Hampshire Department of Employment Security ("DES").  Because, by New Hampshire statute, decisions rendered in connection with unemployment proceedings are inadmissible in court so as not to interfere with independent finding being made, I am not stating or relying on such findings relating to those proceedings.  (RSA 282-A: 180)  At times in this report I do cite facts that are articulated in the DES documents.

### A.   *Mr. Todd's Employment*

The Company employed Garrison Todd as of September 5, 2002 as a Quality Control Technician.[3]  (Bates 129)   He was terminated effective June 3, 2013.

I reviewed the job description provided to me for Quality Control Tech II.  In this role, Mr. Todd was responsible for ensuring product quality by sampling, analyzing and testing products.  The job requires using various scales, compression machines, ovens, aggregate decant machines and aggregate splitters.  (Tech QC II Job Description, p. 1)  The Quality Control Tech II must "[a]ctively manage[] risks by ensuring that all related control activities are implemented

---

[3] He previously worked for Wakefield Materials, a company that Aggregate Industries acquired in 2002.

thoroughly." (Tech QC II Job Description, p. 2) The QC Tech II frequently supervises and instruct other employees. (Tech QC II Job Description, p. 2)

The job description identifies the many physical requirements that are necessary to do the essential job functions. The job requires the lifting of a maximum of fifty (50) pounds and the frequent lifting of twenty-five (25) pounds. (Tech QC II Job Description, p. 3) The QC Tech II is required to climb, balance, stoop, kneel, couch or crawl less than thirty percent of the time. Standing and walking is required thirty to sixty percent of the time. (Tech QC II Job Description, p. 3) The job also requires mental demands thirty to sixty percent of the time, including concentration, decision making, analysis, calculations and working in a time sensitive manner. (Tech QC II Job Description, p. 4)

A review of Mr. Todd's personnel file reveals that Mr. Todd generally met performance expectations over the years. He has not been subject to disciplinary action during his tenure with the Company. (Defendant's Responses and Objections to Plaintiff's First Set of Interrogatories and Requests for Production of Documents ("Defendant's Responses to First Set of Interrogatories"), #11) Mr. Todd's performance history is irrelevant here, as no consideration was given to that history when the Company decided to terminate his employment, as explained below. It was solely due to his activities that arose following a workplace injury that occurred on May 7, 2013.

      B.    *The Accident and Initial Response*

On Tuesday, May 7, 2013, Mr. Todd was struck on the head by the chute of a concrete truck while at a worksite, and he sustained injuries.[4] He was taken by ambulance to Portsmouth Regional Hospital where he was evaluated. According to the New Hampshire Workers' Compensation Medical Form, completed on May 7 by William P. Carter, III, M.D., Mr. Todd complained of a headache and neck pain, and the diagnosis was a closed head injury and cervical strain. I have learned that two (2) Company employees met Mr. Todd at the hospital: Allister Melvin, Technical Services Manager, and Cary Williams, Health & Safety Professional.

On the afternoon of the injury, Mr. Todd was sent for an Oral Fluid Rapid Screen Drug Test, which I am told is standard operating procedure following a workplace accident. The results were negative for any substances.

Many Company officials were notified of Mr. Todd's accident, which I understand is consistent with Company procedures. More specifically, in the afternoon of May 7, Cary Williams sent an email to the following individuals: Graham Hardwick, Ted Knight, Rob Robinson, Rick Labonte, Peter Maldonado, Bob Anderson, Erik Muller, Jeff Ciampa, Rick Winter, Justin Kratochvil, Alex Hall, Christina Prew, and Kellie O'Halloran. Mr. Williams wrote: "Gary Todd suffered a restricted duty injury. He was given a prescription and 2 days restricted duty. He will be working the 2 days of restricted duty at the Raymond office. The investigation is still

---

[4] Mr. Todd also had workers' comp injuries in the past, but they were not relevant and the Company states that it did not take these prior incidents into account in making the termination decision. More specifically, in 2012, he suffered a head laceration; in 2010, he had tendonitis in the shoulder; and in 2008, he had a car accident resulting in neck and right shoulder strain.

ongoing, and will continue tomorrow in Portsmouth. If you have any questions, please let me know." (Bates 385) I note that he sent an email a few hours earlier, advising that Mr. Todd was injured and was being transported by ambulance to the hospital. He advised this group that he was on his way to New Hampshire and would provide more information as it develops. (Bates 387)

The following day, on May 8, 2013, Mr. Todd met with several employees at the Company who fulfill safety roles. An Incident Investigation Report was completed that day, and it was signed by Mr. Todd and three (3) managers. An "ongoing investigation" was taking place.

C.   *Mr. Todd's Reports of His Condition and the Medical Orders He Received*

Medical records and other materials chronicle Mr. Todd's reports of symptoms and the evaluation of his condition, as described below.

1.   *May 7, 2013*

On Tuesday, May 7, Mr. Todd reported to Dr. Carter that he was experiencing headache and neck pain. Dr. Carter released him to work with the following restrictions for two (2) days: unable to lift or carry more than five (5) or ten (10) lbs.; unable to bend, kneel, squat, or climb; able to only occasionally stand, walk and reach. Mr. Todd was not restricted on sitting or driving.

2.   *May 9-10, 2013*

On Thursday, May 9, 2013, Mr. Todd advised a manager, Mr. Melvin, that "he was feeling better but still had some stiffness in his neck and a slight headache." (Affidavit of Allister Melvin, May 22, 2015 ("Melvin Affidavit"), ¶9) On Friday, May 10, Mr. Todd advised Mr. Melvin that "he still had a sore neck and a headache." (Melvin Affidavit, ¶9) They agreed to extend Dr. Carter's restrictions for a third day and, accordingly, Mr. Todd worked desk duty at the Raymond office on May 10.

3.   *May 13, 2013*

On Monday, May 13, Mr. Todd reported to Mr. Melvin that his condition had not improved, and he wanted to see a doctor. (Melvin Affidavit, ¶10) Accordingly, Mr. Melvin accompanied Mr. Todd to an appointment with Dr. Geoffrey Shreck of Access Sports Medicine and Orthopedics that morning. (Melvin Affidavit, ¶10).

According to the New Hampshire Workers' Compensation Medical Form, Mr. Todd reported to Dr. Shreck symptoms of neck stiffness, headaches, and difficulty concentrating. Dr. Shreck diagnosed him with a concussion and cervical strain. Mr. Todd was instructed not to return to work. According to the New Hampshire Workers' Compensation Medical Form completed by Dr. Shreck that day, Mr. Todd had no work capability. Further, he had not reached maximum medical improvement, and it was undetermined whether any permanent impairment resulted from the injury.

The May 13 New Hampshire Workers' Compensation Medical Form also references an "ACE Care Plan" (Acute Concussion Evaluation (ACE) Care Plan) for further instructions. Though the Company only received a copy of this document in discovery, the contents were discussed at the May 13th appointment in the presence of Allister Melvin, who accompanied Mr. Todd that day. According to Mr. Melvin's Affidavit:

> Based on the information reported by Mr. Todd[,] the doctor
> indicated that Mr. Todd had symptoms related to a concussion. At
> this time, Dr. Shreck removed Mr. Todd from all work until his
> next appointment on May 20, 2013. See Exhibit 4: May 13, 2013
> NH Workers' Compensation Medical Form. Until that time, Dr.
> Shreck instructed Mr. Todd in my presence to do nothing but rest,
> stay in a dim lit room, and emphasized that he have no physical
> activity or mental straining.

(Melvin Affidavit, ¶11)

As noted in the Safety Investigative Report, Bates 640, prepared by Cary Williams, the doctor "prescribed [Mr. Todd] five days bed rest with zero stimulation (no television, computers, driving, or exercise)."[5]

Additional documents obtained during discovery corroborate the Company's understanding of the doctor's instructions about no physical activity. First, the May 13 ACE Care Plan, as referenced by Dr. Shreck, is a pre-printed form that the doctor signed with specific instructions for Mr. Todd. Though the doctor used the "school version," he noted, at the top of the second page, that Mr. Todd was not to return to work until a time "TBD." In addition to the admonitions about limiting activities that require thinking and concentrating, the ACE Care Plan highlights that "rest is the key" and that Mr. Todd, as a person with a concussion, should pay "careful attention" to "prevent further injury." Mr. Todd was warned not to participate in high-risk activities, which include sports and riding a bike, and to "limit physical activity." In the section entitled "Gradual Return to Play Plan," Mr. Todd was directed, in the first instruction, to engage in "no physical activity."

Additionally, I reviewed the medical records of Dr. Shreck dated May 13, 2013 on the letterhead "Access Sports Medicine & Orthopedics." While the Company did not have this documentation or the ACE Care Plan at the time it made the decision to conduct further investigation or terminate Mr. Todd, the information is consistent with what Mr. Melvin reported and what was documented in the Safety Investigative Report, upon which the Company relied. In the History of Present Illness section of the document, Mr. Todd complained of difficulty concentrating and, further, stated that sudden movements or driving exacerbated his symptoms of headache and bilateral neck pain. Mr. Todd further reports that rest, sleep, and over-the-counter medications have helped somewhat with his headache pain and symptoms. Mr. Todd reported "fatigue, visual changes, weakness, dizziness, and headaches." In the section entitled "Plan," Mr. Todd

---

[5] I understand that Mr. Williams began preparing this report on the day of the injury, May 7. It is apparent that it was completed by May 20, 2013, based on its contents and the dates referenced.

was advised to "just rest with no watching TV in the dark and no mental or physical straining such as that involved with computer work. Employee is not to return to work. This was discussed with his supervisor, who was here in the clinic today..."[6]

I also received a one-page record from Access Sports Medicine dated May 13, 2013. The record states that rest and sleep make Mr. Todd's condition better, and movements, among other things, worsen it. The record indicates that Mr. Todd has recently experienced weakness, dizziness, and headaches.

A follow-up appointment was scheduled for a week later, on May 20.

> ### 4.    May 20, 2013

The May 20 New Hampshire Workers' Compensation Medical Form indicates that Mr. Todd complained at his appointment that day with Dr. Shreck of "balance issues," a complaint not reflected in earlier medical documentation. Dr. Shreck released Mr. Todd to modified duty, permitting him to work four (4) hours per day. His ability to lift was restricted to ten (10) pounds. His ability to move was restricted; specifically, he was instructed to bend, kneel, squat, climb or drive only occasionally.

A May 20 record from Dr. Shreck from Access Sports Medicine & Orthopedics details the doctor's visit from that day. Though this record was not available to the Company until discovery, it corroborates other information the Company relied upon in making its decisions. At that visit, Mr. Todd complained of right-sided neck soreness and balance issues. He was referred to vestibular physical therapy for treatment of his balance and cervical issues. He was given a note to return to work with modified duty if available with the following restrictions: "No lifting or carrying greater than ten pounds, occasionally bend, no squat or climb, and no climbing ladders. Sit and rest as needed."

> ### 5.    May 28, 2013

Mr. Todd visited with Dr. Shreck again on May 28, 2013. According to the New Hampshire Workers' Compensation Medical Form, Dr. Shreck noted that Mr. Todd reported increased nausea and dizziness. Dr. Shreck continued Mr. Todd's restrictions, and he referred him to a concussion specialist. A follow-up appointment was scheduled for May 29.

A May 28 typewritten record from Dr. Shreck states that Mr. Todd reported that he had increased nausea and dizziness, especially with sudden head movements. He was diagnosed with benign positional vertigo in addition to vestibular dysfunction and cervical strain. He was advised to continue vestibular physical therapy, return to work with continued modified duty and decreased work hours, and to see Dr. Heaton, a concussion specialist. (Bates 683)

---

[6] I note that a different version of the May 13 medical record from Dr. Shreck exists, which differs slightly in the Plan. In this other version, the doctor provided "recommendations that he just rest with no watching TV in the dark and no straining computer." The reference to "physical" is missing, which is curious.

      6.     *May 29, 2013*

On May 29, 2013, Mr. Todd visited Kevin Heaton, D.O. The doctor's note indicates that Mr. Todd complained of headaches, balance problems, and a feeling of vertigo. He states that he had problems concentrating, felt foggy, and felt "more slow or emotional and sleeping more than usual." He complained that working in the office, answering phones, and looking at the computer bothered him. (Bates 681)

      D.     <u>Investigation</u>

The Company conducted an initial accident investigation, which was subsequently elevated to include surveillance of Mr. Todd after his condition worsened under circumstances that appeared suspicious to the Company.

Pursuant to its policies, the Company commenced an accident investigation on May 7. I understand that following any workplace accident, a root cause analysis is conducted to determine what may have caused the accident and what preventative steps can be implemented in the future to avoid reoccurrence. That was done in this case, and a Safety Investigative Report was prepared. (Bates 640-645) The report contains a synopsis of the accident, the employee's statement of injury, a witness statement of what occurred, analysis, and corrective actions. Significantly, several corrective actions were noted, underscoring the gravity of the situation and the Company's commitment to learn from it. The corrective actions in this case include that certain sampling procedures be developed, a red alert for lost time injury be developed, a discussion take place about the incident at yearly training, and a 2-wheeled wheelbarrow to be used to increase stability and prevent an employee from holding the wheelbarrow while simultaneously taking a sample.

The Company also conducted a reenactment of the incident to further try to understand what happened and why. I watched a video recording of this reenactment, which highlights that the Company took the May 7 accident very seriously.

After Mr. Todd's May 13 medical appointment, the Company escalated the investigation to determine whether Mr. Todd's behavior was consistent with his subjective reports of his symptoms. The Company explained that any decision to conduct surveillance is fact-based depending on individual situations. There is no specifically defined set of factors, elements, or circumstances relating to when an employee is placed under surveillance. (Defendant's Responses to Plaintiff's Second Set of Interrogatories, #3)

The Company's decision to conduct surveillance of Mr. Todd after the May 13, 2013 appointment was "primarily due to the significant change in his work status between May 7 and May 13." (Defendant's Responses to First Set of Interrogatories, #5). The following people were involved in, or aware of, the decision: Justin Kratochvil, Regional Occupational Health & Safety Manager, Jeff Ciampa, Operations Manager, Kellie O'Halloran, Safety Coordinator, Cary Williams, Health & Safety Professional, and Tammie Pierce, Gallagher Bassett Senior Claims Adjuster. (Defendant's First Supplemental Responses and Objections to Plaintiff's Second Set of Interrogatories and Requests for Product of Documents, #2). I understand that the Company

does not conduct surveillance without the involvement of the General Manager, Mr. Knight. Here, before the plan to conduct surveillance was implemented, Mr. Knight was briefed and agreed that surveillance was warranted. (Defendant's First Supplemental Responses and Objections to Plaintiff's Second Set of Interrogatories and Requests for Product of Documents, #2).

Through Tammie Pierce and Gallagher Bassett Services, the Company engaged SRC Investigations to conduct the surveillance of Mr. Todd. [7] (Defendant's Responses to First Set of Interrogatories, #5; Defendant's Responses to Plaintiff's Second Set of Interrogatories, #2)

The SRC Investigation Report dated May 22, 2013 details surveillance conducted on May 16, 17, 18 and 20, 2013.

After SRC Investigations conducted its initial surveillance, it provided its report and video to Rick Winter, the Regional Human Resources Manager. After reviewing that information, Mr. Winter spoke with Jeff Ciampa. Together they concluded that additional surveillance should be conducted. Also, during this discussion, Mr. Ciampa suggested that a Nurse Case Manager be assigned to track Mr. Todd's recovery. Mr. Winter then apprised Graham Hardwick, SVP, who agreed. Mr. Winter then informed Ted Knight, Allister Melvin, and Cary Williams that additional surveillance would be conducted. (Defendant's First Supplemental Responses and Objections to Plaintiff's Second Set of Interrogatories and Requests for Product of Documents, #2).

The SRC Investigation Report dated May 27, 2013 details surveillance conducted on that day. Again, Mr. Winter reviewed the report and video.

I reviewed the CDs containing videos of the surveillance. Below, I highlight some of the more relevant observations of the investigator and add some insight based on my viewing:

   *Thursday, May 16, 2013*

On this sunny day, Mr. Todd was observed engaging in a number of activities:

- Mr. Todd and a woman (his fiancée) exit the house. The woman drives them to the Rockingham Mall and went to Sears. (I observe him bending down to adjust a plant.)

- He was observed moving freely with no sign of restriction or distress.

- He purchased a high-powered heavy-duty pressure washer (as well as miscellaneous products, I observe).

---

[7] Mr. Todd had applied for workers' compensation benefits, and the workers' compensation administrator filed a denial based on surveillance video. The details of the workers' compensation claim and proceedings relating thereto are irrelevant for purposes of this report.

11

- He drove his vehicle to the loading area outside of Sears.

- Mr. Todd leaned forward into the rear of the vehicle and moved items around. The investigator states that "they" placed the machine into the rear of the vehicle.[8]

- Mr. Todd reentered the mall.

- Mr. Todd went to Tuscan Market in Salem; the woman drove.

- Mr. Todd went to Circle K Market in Salem; the woman drove.

- Mr. Todd went to East Coast Lumber in Hampstead; the woman drove.

- When he arrived home, he carried several bags inside, and he subsequently unloaded items into the garage. (I observe him bending.)

- Mr. Todd was observed lifting the pressure washing machine from the vehicle and carrying it into the garage. (I observe that it is a large box.)

- I observe that he bends down to straighten out plants before he enters his house.

*Friday, May 17, 2013*

On this sunny day, I note that Mr. Todd moves about freely in his yard and garage area.

- Mr. Todd was observed carrying one or two white plastic bags into the garage.

- After leaving the house, he returned to the garage carrying a large black plastic bag. (From my observation, he appears to struggle with it; it appears heavy.)

- He entered the garage again carrying a white plastic bag.

- He traveled to Portsmouth Regional Hospital; the woman drove.

- He went to Lowe's in Greenland; the woman drove.

- He exited Lowe's carrying a large bag of grass seed in both hands; he leaned forward and placed it in the trunk.

---

[8] I could not see a Sears employee in the video.

- He made various stops, at Cumberland Farms, New Hampshire SPCA, Memories Ice Cream Farm Stand & Flowers.

*Saturday, May 18, 2013*

On this sunny day, I observe that Mr. Todd is frequently bending, stooping, squatting and moving as he engages in this very physical project. He was outside of his house from about 9:50 a.m. until about 1:46 pm. for a total of four (4) hours. He engaged in the following activity:

- Mr. Todd began working on a Jeep, appearing to rotate the tires. He squatted down at the driver's side front tire with a lug wrench and removed the tire. He rolled the tire to the passenger side of the Jeep. He returned to the driver's side and squatted down at the left front side of the Jeep. He then went over to the passenger side and squatted down out of view. He moved freely with no sign of restriction or distress. He rolled the tire back to the driver's front side of the vehicle and placed it on the ground. He squatted down at the front left tire area and then stood the tire up and appeared to secure it to the vehicle. In general, it appeared that he was rotating the tires on the Jeep. He laid on his back in the front of the Jeep, then got up and squatted to the ground. He utilized a lug wrench freely and moved freely. He wheeled a portable floor jack to the right side of the vehicle. He squatted down at the right corner of the Jeep, stood up, bent fully forward, and stood up a tire that was lying flat on the ground and rolled it close to the Jeep. He squatted and secured the tire to the vehicle.

- Once he finished with the Jeep, he approached the Nissan and knelt down and leaned on his elbow as he looked under the vehicle. He squatted down at the rear left tire, laid down on the ground, and looked underneath the vehicle.

- He bent fully forward inside the garage at a large bucket. He sprinkled an unknown substance onto the driveway. He picked up the bucket and carried it inside the garage.

- He jacked up the right rear side of the Maxima off of the ground. He laid on his back and looked underneath the vehicle.

- He stepped up onto the rear of the vehicle with his right leg several times and then appeared to lightly jump on the vehicle.

- He appeared to add oil and window washer to the Jeep and otherwise "putter" around the garage.

- He pulled a wood-sided trailer by hand. He positioned it behind the Jeep and hooked it up to the rear of the vehicle.

13

*Monday, May 20, 2013*

- Mr. Todd drove to Access Sports Medicine & Orthopedics.  He moved freely with no signs of restriction or distress.

- Mr. Todd went to work at Aggregate Industries.

*Monday, May 27, 2013*

- Mr. Todd raised the hood of the Maxima and attached jumper cables to the Maxima and a Saab.  (I observed that he regularly bent forward to do this work.)

- He also bent forward several times and was moving pots of flowers or plants around from the sliding door to the left of the driveway.  He moved freely with no sign of restriction or distress.

- I observed that he leaned into the car, and then drove to Landscaper's Depot in Kingston; he exited the store with a bag of loam or mulch and placed it in the trailer attached to his Jeep.

- He backed the trailer into a driveway of a home on Audrey Lane.

- With his fiancé, Mr. Todd left the house with an empty trailer bed, and he drove to Landscapers Depot, where he obtained another load of mulch and returned to Audrey Lane.  They repeated this trip two (2) additional times for a total of four (4) loads of loam.  On the fourth trip, Mr. Todd entered the building and exited with what appeared to be screen material.

E.    *Chronology of Communications Prior to the Termination Decision*

I reviewed a number of email communications following the workplace accident.

May 20, 2013 – Mr. Todd emailed Allister Melvin and Cary Williams, Health & Safety Professional for Aggregate Industries, and attached paperwork from his May 20 appointment and advised that his next appointment is on May 28.

May 20, 2013 – Cary Williams emailed Justin Kratochvil, Regional Occupational Health & Safety Manager for Aggregate Industries, and Kellie O'Halloran, Safety Coordinator, and advised that Mr. Todd has been placed on restricted duty and his next appointment is May 28.

May 20, 2013 – Justin Kratochvil emailed Cary Williams, Kellie O'Halloran, and Jeff Ciampa, and questioned whether the restriction was for four (4) hours per day, and he further stated, "***He had a week off to rest.  Now he needs more?  I just don't get it... Tammie – what is the status on the surveillance?***"  (Emphasis supplied)

14

May 20, 2013 – Tammie Pierce emailed Justin Kratochvil, Kellie O'Halloran, and Jeff Ciampa advising that Mr. Todd was found to be picking up a power washer on Friday, May 17; further surveillance was approved.

May 21, 2013 – SRC Investigations sent an email to Tammie Pierce. SRC advised that he spoke with Jeff Ciampa yesterday and provided an update. He reported that, on Thursday, May 16, the first day of surveillance, SRC saw him purchase a large pressure washing machine at Sears, and he unloaded it and put it inside his garage. The next day, on Friday, May 17, he was observed carrying large bags into the garage. After a visit to Portsmouth Regional Hospital, Mr. Todd and a female companion drove to Lowe's in Greenland, New Hampshire. There, he placed a large bag of lawn or garden product into the trunk of his vehicle, and left. He did other errands as well, including going to Cumberland Farms, the New Hampshire SPCA, and an ice cream stand.

On Saturday, May 18, Mr. Todd was observed rotating the tires on his car, moving a utility trailer to the back of his Jeep by hand, and attaching it to a vehicle. The surveillance showed him working outside for several hours.

May 20, 2013 – The investigator gave a similar synopsis of the surveillance that had been conducted to date, as described above in the email to Tammie Pierce.

May 21, 2013 – SRC Investigations emailed Justin Kratochvil, Kellie O'Halloran, Jeff Ciampa, and Cary Williams, and advised that Tammie Pierce from Gallagher Bassett asked him to provide an update to the Company.

May 24, 2013 – Tammie Pierce forwarded the May 21 surveillance update to Kellie O'Halloran.

May 28, 2013 – Kellie O'Halloran emailed Tammie Pierce and gave authorization for a Nurse Case Manager to research medical claims on Garrison Todd. (I am told that the medical information sought was related to the May 7 injury and was produced on May 31 (Bates 668))

May 28, 2013 – Garrison Todd emailed Cary Williams and Allister Melvin and attached a recent "appt." with Dr. Shreck and advised that he had an appointment with Dr. Heaton on May 29.

May 29, 2013 – Tammie Pierce advised that she was "setting up now."

May 29, 2013 – Cary Williams emailed Justin Kratochvil and stated that Mr. Todd still has work restriction of four (4) hours per day, and he said he wanted to discuss further on the phone.

May 31, 2013 – Patricia Autenrieth, R.N., C.C.M., Field Case Manager for Coventry Workers' Compensation Services wrote to Tammie Pierce at Gallagher Bassett and sent updated medical records on Mr. Todd, which included the May 29, 2013 Dr. Heaton records, May 28, 2013 Dr. Shreck records, and New Hampshire Workers' Compensation Medical Forms. She questioned about what Mr. Todd was observed doing, and noted that he had a part-time, light duty work capacity and had been cleared to lift a maximum of ten (10) pounds.

Also, on May 31, 2013, the Company suspended Mr. Todd from employment pending the results of the ongoing investigation.[9]  The Company considered Mr. Todd's behavior, as captured on video, to be a "serious violation."  (Defendant's First Supplemental Responses and Objections to Plaintiff's Second Set of Interrogatories and Requests for Product of Documents, #2).

June 3, 2013 – Jeff Ciampa emailed Rick Winter and advised that a Nurse Case Manager was to interview the doctor after a June 5 evaluation, and he attached doctor notes that Patricia Autenrieth had forwarded.  (I have no information about whether an interview actually took place.)

June 3, 2013 – Rick Winter emailed Tammie Pierce and asked about notes from the doctor visits prior to May 20.

June 3, 2013 – Rick Winter emailed Jeff Ciampa and asked him if the Company has notes from Mr. Todd's visits prior to May 20 and said they would be helpful.

June 12, 2013 – Rick Winter emailed Tammie Pierce and asked about the Nurse Case Manager's meeting with the doctor and said that information was "imperative" in making a decision in moving forward.  (I have no information about whether a meeting ever happened.)

June 12, 2013 – Tammie Pierce emailed Rick Winter and advised him that she will follow up with the nurse.

June 13, 2013 – Tammie Pierce responded to Rick Winter and said, "The doctor has the information and we'll get a response by the time he is seen again 6/17/13."

June 13, 2013 – Rick Winter emailed Tammie Pierce and said he understood that the Nurse Case Manager was going to be speaking with the doctor, and not that the doctor was going to respond to an information request.  (I am unaware of additional communications.)

   F.   *Termination Decision*

As noted above, surveillance and further investigation was conducted before and after the Company suspended Mr. Todd on May 31st.  In Defendant's Second Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories and Requests for Production of Documents, #7C, the Company detailed the steps it took which led to the termination decision. Rick Winter, Regional HR Manager, gathered the information during the investigation.  The information included, among other things:

- The SRC Investigation Reports dated May 22 and May 28, 2013;

- Videos taken by the investigator;

---

[9] In the Company's Employee Change Form, dated June 4, 2013, the Company indicates that Mr. Todd was suspended without pay as of May 31, 2013.

- The New Hampshire Workers' Compensation Form dated May 7, 2013, returning Mr. Todd to work with restrictions after he received medical attention;

- The New Hampshire Workers' Compensation Form dated May 13, 2013, removing Mr. Todd from work entirely, including light duty which he had been doing;

- Information from Mr. Melvin and otherwise about the doctor's instructions to Mr. Todd on May 13 for complete rest in a dim room, with no mental or physical straining, until his next appointment on May 20;

- Medical records from May 20 and May 29, 2013; and

- Subsequent New Hampshire Workers' Compensation Forms.

The following people were involved in the termination decision: Rick Winter, Ted Knight, SVP/General Manager; and Graham Hardwick, SVP. (Defendant's Responses to First Set of Interrogatories, #7) Mr. Winter reviewed the documentation outlined above. On June 14, a conference call took place involving Mr. Winter, Mr. Knight and Mr. Hardwick, and Mr. Winter advised them of the above information. Mr. Winter did not provide a recommendation regarding Mr. Todd's employment status; the three gentlemen unanimously agreed that termination was warranted under the circumstances.

Following that conference call, I am told, the Company consulted with its internal legal department prior to terminating Mr. Todd. (New Hampshire Employment Security Appeal Tribunal decision, Bates 0005)

The decision was made to terminate Mr. Todd on June 18, effective June 3. Central to the termination decision was the video surveillance showing Mr. Todd performing activities between May 13 and 20, including physical ones, which appeared to contradict and violate (1) the medical restrictions his doctor had prescribed, and (2) the medical note removing Mr. Todd from all work capacity, including light duty. (Defendant's Responses to First Set of Interrogatories, #5) The surveillance video showed that Mr. Todd was capable of performing physical activities and, yet, he reported to the Company that he was unable to come to work even on light duty.

By letter dated June 18, 2013, the Company advised Mr. Todd that his employment was terminated, effective June 3, 2013, which was the first workday that Mr. Todd missed after the May 31 suspension.[10] On June 19, I am told that Carla Shattuck, HR Generalist, called Mr. Todd to tell him about the termination decision. In the June 18th letter, signed by Rick Winter, the Company states that it conducted an investigation, including reviewing medical records and surveillance video following the injury Mr. Todd reported on May 7, 2013. The Company noted a "significant discrepancy between the medical condition you conveyed to your physician, the

---

[10] In the Company's Employee Change Form dated June 18, 2013, the Company indicated that Mr. Todd was terminated for cause, and approval was given by Allister Melvin, Ted Knight, and Rick Winter.

prescribed medical response to the condition you alleged, and your physical condition observed under surveillance." The Company explicitly stated, "A failure to comply with doctor prescribed restrictions puts the injured employee and company at further risk." (Defendant's Second Supplemental Response to First Set of Interrogatories, #7c)

The information I reviewed shows that Mr. Todd understood the reason for termination. For instance, in the New Hampshire Employment Security Appeal Request Notice, Mr. Todd articulated the reason for his termination: "Discharged for misconduct. Not following doctors (sic) orders." (Bates 054)

The Company states that its decision to suspend and subsequently terminate Mr. Todd pending the results of an investigation is consistent with Company policies and procedures. (Defendant's Answers to First Set of Interrogatories, #6) While not an identical factual scenario, the Company states that it has suspended employees who have failed to report a workplace injury within 24 hours in order to investigate the reason why the employee failed to promptly report the injury. (Defendant's Response to Plaintiff's First Set of Interrogatories, #10) For example, on May 28, 2013, the Company gave a driver from Manchester, New Hampshire a written warning for this violation. Also, in August of 2014, the Company gave a two-day suspension to a mechanic in Saugus, Massachusetts for a similar violation.

### G. *Company Policies*

The Company maintains an Employee Handbook, a Health and Safety Manual, and several stand-alone policies including the Code of Ethics (AI.08.001.v7) and the Safety Recognition, Rewards, and Consequences Policy, which are particularly relevant here. I am told that Mr. Todd received these documents at orientation and throughout his employment. He signed an Acknowledgement of Receipt and Understanding on August 18, 2005 relative to Code of Ethics training. By his signature, he acknowledged receipt of, understanding of, and compliance with all policies set forth in the handout. He further attested that no conflict of interest existed. Also, he signed an Acknowledgement Receipt for the Employee Handbook a month later, on September 19, 2005.

Training is important to the Company as well. In conjunction with the policies outlined below, I also reviewed material from a number of training sessions, including OH&S 2013 Aggregate Industries Safety Start-Up training materials, Safety Working On and Around Machinery training materials, and the 2012 Compliance Training.

The most recent annual training before Mr. Todd's termination was conducted in Peabody, Massachusetts on March 16, 2013; Mr. Todd attended that training. Mr. Todd also attended the 2012 Compliance Training. The PowerPoint that went along with that training emphasizes that the Company places a high value on the ability of its employees to make ethical decisions which do not compromise the Company in any way. I found a number of slides particularly noteworthy, including the following:

- "Our decisions and actions define us."

- "We must ask ourselves everyday, Are my actions and decisions helping to move our company forward? -or- Do my actions and decisions have us headed in the wrong direction?"

- "Our AI Code of Ethics guides our decision making.  We must conduct ourselves with <u>Integrity, Honesty and Truthfulness</u> at all times.  We must avoid the perception of wrongdoing."

- "Do the right thing even when no one else is looking."

### 1. Ethics

The Employee Handbook contains a summary of the Code of Ethics; the Code itself is a stand-alone document.  (Employee Handbook, "General Provisions," p.4)  According to the Handbook, the Code of Ethics is intended as "guidance regarding business ethics, conflicts of interest, and ***appropriate standards of conduct that underlie your responsibilities as an employee***." (Employee Handbook, p. 4) (Emphasis added)  The Handbook directs employees to "conduct business in accordance with the letter, spirit, and intent of all relevant laws and to refrain from any illegal, dishonest, or unethical conduct."  The Handbook also states, "In general, the use of good judgment, based on high ethical principles, will guide you with respect to lines of acceptable conduct." (Employee Handbook, 4)

The Code of Ethics itself states:

> The principles and standards set forth in this Code should be used as guidelines in your everyday activities.  Aggregate Industries' management is committed to abide by the principles and standards set forth in this Code; to ensuring that employees are aware of this Code; and to ensuring that all employees abide by the principles and standards set forth herein.

Among the Code's provisions, several are particularly relevant to the Company's handling of Mr. Todd's behavior.  Specifically, the Code states that "[e]mployees shall conduct their employment activities with the highest principles of honesty, integrity, truthfulness and honor. To this end, employees are to avoid not only impropriety, but also the appearance of impropriety." (Code of Ethics, 4.1)  Supervisors have an enhanced duty under the Code to "exemplify, support and enforce" it, and they are "responsible for the actions of their employees." (Code of Ethics, 4.9)  Both the Code and the Employee Handbook warn employees that violations may result in discipline, including termination.  (Code of Ethics, 4.10)

### 2. Complaints, Investigation Procedures and Employee Discipline

The Company Handbook contains a policy on "Reporting Complaints/Violations," which states: "Each employee has an individual responsibility to report any activity by an employee, customer, vendor or subcontractor that appears to violate the applicable laws, rules, regulations, the

Employee Handbook, the Code of Ethics or other Company policy. Failure to promptly report violations of which an employee has knowledge constitutes a violation of Company policy." (Employee Handbook, p.7)  The policy contains a non-retaliation provision and explains the process for submitting complaints.

The Company policy on "Complaint Investigation" provides as follows: "Complaints or allegations of violations of the law, rules, regulations or Company policy will be investigated. Investigations may include the use of outside investigators on behalf of the Company." (Employee Handbook, p. 8)  The policy goes on to state: "During or after the investigation or processing of any complaint, the Company reserves the right to impose counseling or disciplinary action which, in its judgment, most appropriately addresses the problem. If it is determined that improper conduct occurred, the Company will take remedial action as it deems commensurate with the severity of the offense and necessary to stop the improper conduct. The remedial action may include, but is not limited to, verbal and/or written reprimands, counseling, training, transfer, demotions, suspension with pay, suspension without pay, and/or termination." (Employee Handbook, p. 8)

The Company also has a "Separation from Employment and Disciplinary Action" policy which provides, in pertinent part:  "Disciplinary action, up to and including termination of employment, may, in the sole discretion of the Company, be taken against an employee for unsatisfactory performance, misconduct or misbehavior, or any other reason deemed appropriate by the Company." (Employee Handbook, p. 42)

> 3.    *Safety*

Safety is of paramount importance to the Company, as its business involves producing high quality aggregate-based construction materials.  As explained in Defendant's Response to Plaintiff's First Set of Interrogatories, #8-9, the Company maintains policies and conducts training for employees on safety and security.  Company policies and training material exemplify a very strong commitment to safety.  I found the following policies and documents to be particularly pertinent to the issues I was asked to review.

> ➢ *Employee Handbook*

The Employee Handbook contains a detailed "Safety and Security" policy, which states: "The Company is committed to maintaining the highest standard of safety by dedicating the resources necessary to create an environment where their work activities without injury or incident." (Employee Handbook, p. 44)  The Safety and Security policy explains that the Company "…adheres to the following Principles of Safety Excellence:

- All incidents are preventable.

- Management is responsible for preventing injuries.

- All operating hazards are to be identified and controlled.

- Risks associated with hazards can be reduced.

- ***Working safely is a condition of employment.***

- All employees must receive safety training.

- Involvement by all employees is essential.

- Safety is the way we do business."

(Employee Handbook, p. 44) (Emphasis added)  The policy provides detailed information about reporting workplace injuries and includes the "Five Cardinal Rules of Safety:"

1. Do not override or interfere with any safety equipment, nor let anyone else override or interfere.

2. Personal Protective Equipment (PPE) rules, applicable to a given task, must be adhered to at all times.

3. Isolations and Lock Out Procedures must always be followed.

4. No person may work if under the influence of alcohol or drugs.

5. All injuries and incidents must be reported.

(Employee Handbook, p. 44)

> ➤ *Health and Safety Department*

The Company actively promotes employee participation in safety.  The Health and Safety Department maintains a Safety Recognition, Rewards, and Consequences Policy.  The purpose of this policy "is to describe the Company's approach to managing safety related behaviors to promote consistency in the recognition and enforcement of our safety rules, regulations, policies and procedures."  (Safety Recognition, Rewards, and Consequences Policy)  The policy provides, "All supervisors are responsible for both compliance with and enforcement of this policy.  Failure to enforce this policy may result in disciplinary action up to and including termination."  Further, "[e]very employee is responsible for adherence to this policy.  Failure to adhere to this policy may result in disciplinary action up to and including termination."  (Safety Recognition, Rewards, and Consequences Policy)

The policy is in place to "recognize and/or reward behaviors that create a safer workplace, and to discipline behaviors that endanger employees, contractors, or visitors within out workplace."  (Safety Recognition, Rewards, and Consequences Policy)  In the policy, the Company thoroughly explains that certain "undesired behaviors," delineated in the policy into two categories, will result in consequences.  "Category 1" undesired behaviors are those that "have the potential to endanger life" and "will subject employees to an immediate termination review."

21

(Safety Recognition, Rewards, and Consequences Policy, Section 5.2)  The following are examples of Category 1 behaviors:

- Violation of the Cardinal Rules or a life critical standard or policy (examples include, but are not limited to the below).  Note that this is not intended to include minor technical violations of a standard, but rather a significant deviation.

  - o  Lockout/Tag out

  - o  Confined Space

  - o  Fall Protection

  - o  Failure to wear a life jacket where required

  - o  Hot work violation in an area where flammables are present

  - o  Failure to ground flammables during a transfer operation

- Grossly negligent or willful behavior, examples of which include:

  - o  Instructing an employee, contractor or visitor to violate or compromise a life critical standard or policy

  - o  Falsification of records related to injuries or safety incidents

  - o  Related Category 2 violations

(Safety Recognition, Rewards, and Consequences Policy, Section 5.2)

"Category 2" undesired behaviors are "[s]erious, but non-life threatening violations." (Safety Recognition, Rewards, and Consequences Policy, Section 5.2)  Engaging in Category 2 behaviors "will subject an employee to an immediate suspension review."  The policy includes a non-inclusive list of examples, including failure to complete and document required safety reviews, operating equipment "without required task training or pre-job inspection," "[r]eckless operation of mobile equipment (this could move up to Category 1 depending on the circumstances)," and "[r]epeated general safety violations."

Under the sub-heading, "All other violations of safety rules," the policy states:  "Company safety policies, procedures and rules exist to ensure the safety of employees and compliance with regulations.  Safety violations falling outside the categories described above will subject the employee to either the disciplinary actions identified in the policy, procedure or rule which has been violated, or to the progressive discipline policy. [...] Decisions on progressive discipline will be determined locally by local leadership and shall be in accordance with any relevant

collective bargaining agreement." (Safety Recognition, Rewards, and Consequences Policy, p. 5)

> *U.S. Health and Safety Manual*

The Company's commitment to safety is further emphasized in its U.S. Health and Safety Manual. This Manual sets forth the Company's expectation for employee participation in maintaining a safe workplace and minimizing risks to themselves, to others, and to Company property, equipment and plants. The Company's expectations are introduced at the start of the Manual in a letter to employees from Bill Bolsover, Aggregate Industries Group Chief Operating Officer. I note that this introductory letter emphasizes the Company's credo that "all injuries and incidents in the workplace are preventable" and, further, notifies employees that "[w]orking safely is a condition of employment.[]" The entire text of the letter is as follows:

> Dear Fellow Employees:
>
> Aggregate Industries' management team is committed to reducing incidents in the workplace. Our managers recognize their responsibilities for managing Health and Safety within the Company's operations, and we believe that all injuries and incidents in the workplace are preventable.
>
> Our regional safety professionals have produced this Health and Safety Manual to education all employees on our Health and Safety policies and procedures. Please review this safety manual carefully, and contact your immediate supervisor or Regional Safety Manager if you have any questions.
>
> I would like to take this opportunity to remind all of our employees that Safety is a shared responsibility, and begins with you. Working safely is a condition of employment for all employees and contractors.
>
> Reducing incidents, educating our employees, and ultimately improving our safety culture are top priorities at the highest level of management within Aggregate Industries. In order to achieve these goals, we need each of our employees to re-commit themselves to working SAFELY, and I thank you for your efforts.
>
> Sincerely,
>
> Bill Bolsover
> Group Chief Operating officer
> Aggregate Industries plc

(U.S. Health and Safety Manual, p. 2) The Manual also contains the Company's overarching Health & Safety Policy Statement:

> Aggregate Industries is committed to maintaining the highest standards of
> safety be devoting the human and capital resources necessity to create a
> working environment in which our people can work without injury or
> incident.
>
> Our managers recognize their responsibility for managing health and
> safety within the Company's operations, and believe that all injuries and
> incidents at work are preventable.
>
> Working safely is condition of employment for employees and
> contractors.

(U.S. Health and Safety Manual, p. 3)  The Health & Safety Policy Statement expresses
management's strong commitment to employee safety.  Managers are required to dedicate
necessary resources to safety and to implement safety policies.  They are required to measure and
review performance targets to correct deficiencies and ensure continuous improvement.
Managers are also required to "take appropriate action against any individual or contractor who
contravenes the Company's safety rules and standards."  Further, managers are charged with
training and coaching employees to ensure that "employees are competent to undertake their
duties without causing injury or ill health to themselves or others or damage to property, plant
and equipment." (U.S. Health and Safety Manual, p. 3)

The Manual contains ten (10) Cardinal Rules outlining what the Company expects of each
employee in order to ensure the safety of all.  The first rule is this:  "Do not undertake, or allow
any person to undertake, any unsafe act or work in unsafe conditions." (U.S. Health and Safety
Manual, p. 5)

Additionally, the Manual's Safety Problem Solving policy emphasizes that supervisors must
"watch for and correct unsafe conditions and behaviors immediately." (U.S. Health and Safety
Manual, p. 6)  This Policy states, "It is the intent of Aggregate Industries to provide a safe
workplace for all employees.  Supervisory personnel have been instructed to watch for and
correct unsafe conditions or behaviors immutably.  [. . . ] It is important that all employees be on
the lookout for unsafe conditions and behaviors."  The Policy provides specific mandatory action
steps to employees who "observe a condition or behavior that you believe is unsafe."  Employees
must correct the unsafe condition if possible, and must "[a]ssist co-workers who engage in
unsafe behavior by suggesting safer means of accomplishing the task or avoiding the hazard."  If
correcting the unsafe condition is not possible, the employee is instructed to report it.  Further,
the Policy states that employees with "any" supervisory authority has "been instructed to take
corrective action or contact someone who can when a safety concern is raised."  The Policy ends
with the statement:  "If we work together, we can all work safely." (U.S. Health & Safety
Manual, p. 6)

The Manual contains thirty-seven (37) mandatory Safety Rules pertaining to specific situations
and safety risks related to operating equipment, electrical equipment, clothing, PPE, chemicals,
and vehicles.  Rule thirty-seven (37) admonishes employees, again, "***Working safely is a***

**_condition of employment. All injuries can be prevented_**. (U.S. Health and Safety Manual, pp. 7-12) (Emphasis added)

The Manual contains an Incident Reporting Policy, which focuses on risk identification and remediation. "The purpose of this Policy is to establish requirements for conducting a thorough accident investigation so that the information can be utilized in the prevention of a recurrence of the same or similar accidents. The contents of this policy [are] considered to be minimum guidelines to be followed when conducting an investigation." (U.S. Health and Safety Manual, p. 27) Under the Incident Reporting Policy, the General Company Policy states that all incidents and accidents must be investigated "thoroughly and accurately." (U.S. Health and Safety Manual, p. 27) "A thorough investigation should include more than just the statement of the employee involved. [...] Take the time to be THOROUGH! Your investigation should attempt to get to the root cause of the accident." (U.S. Health and Safety Manual, p. 27) The Incident Reporting Policy reiterates the Company's emphasis on prevention: "The purpose of this Policy is to establish requirements for conducting a thorough accident investigation so that the information can be utilized in the prevention of a reoccurrence of the same or similar accidents." (U.S. Health & Safety Manual, p. 27)

Further, in line with the Company's overall focus on risk identification and remediation, the Incident Reporting Policy has a section on Near Miss Reporting. A "near miss" is defined as an incident where there was a "likelihood ... of injury or property damages [which did not occur] because of luck or some other intervening factor. Near misses are unique because they give us a second chance to correct dangerous behaviors or conditions before they result in future injury or property damage." (U.S. Health and Safety Manual p. 29)

The policy notifies employees that the Company will take action if it finds that an employee has acted with "willful disregard of safety rules and/or safe work practices." (U.S. Health and Safety Manual, p. 30) "[W]hen an investigation reveals that an employee's willful disregard of safety rules and/or safe work practices has endangered other persons or property, appropriate disciplinary action will be administered." (U.S. Health and Safety Manual, p. 30)

## IV.   _OPINIONS_

### A.   _The Company Acted Reasonably and in Accordance with Company Policy and Best Practices When It Investigated Mr. Todd's Injury and His Compliance with Medical Orders_

Employers are obligated to conduct investigations in a number of circumstances, including when a workplace accident has occurred. Investigations should be conducted in accordance with the employer's policy, if one exists, and industry standards. Following policy is a matter of workplace due process because policies set employees' expectations. Fairness dictates that employees should be aware of the circumstances that could trigger an investigation and the process that will be followed. At times, an employer is obligated to investigate an employee's off-duty conduct. In this situation, the employer must act in good faith, and the investigation must relate to the company's legitimate business interests.

Aggregate Industries takes its safety responsibilities seriously.  The investigation in this case started out as a mandatory accident investigation.  It was expanded to include surveillance after Mr. Todd's May 13 medical appointment because the information reported by Mr. Todd that day, and the resulting work restrictions, gave rise to concern that Mr. Todd was not truthfully reporting accident-related information.  It is my opinion that the Company complied with its own policies, which put Mr. Todd on notice that the Company is legally mandated to conduct a full and thorough investigation of workplace accidents and injuries.  The Company also complied with best practices for conducting its investigation by involving the appropriate people in the decision to investigate, selecting an appropriate investigator, investigating thoroughly, documenting the investigation, carefully evaluating the information obtained before making an adverse decision, and following up.

> *1.    The Company Complied with Company Policy When It Investigated Mr. Todd's Injury and His Compliance with Medical Orders*

In view of the unexplained exacerbation of Mr. Todd's condition between the May 7 and May 13 medical appointments, Company policies mandated the accident investigator(s) to explore whether Mr. Todd may have falsified his reported symptoms or otherwise engaged in negligent or willful behavior implicating safety and compliance.  In reaching this opinion, I examined the information available to the Company at the time the decision was made, that is, the May 7 and May 13 New Hampshire Workers' Compensation Medical forms and Mr. Melvin's account of the medical appointments on those dates.  I weighed this information against Company policies and determined that the expanded investigation was authorized.  The following policies are especially relevant:

- Incident Reporting Policy (Health & Safety Manual, pp. 27-30)
- Safety Recognition, Rewards, and Consequences Policy
- Cardinal Rules (Health & Safety Manual, pp. 5-6)
- Health and Safety Policy Statement (Health & Safety Manual, p. 3)
- Mandatory Safety Rules (Health & Safety Manual, pp. 7-12)
- Safety and Security, Principles of Safety Excellence (Employee Handbook, p. 44)
- Complaint Investigation (Employee Handbook, p. 8)
- Safety Problem Solving (Health & Safety Manual, p. 6)
- Code of Ethics and Employee Handbook summary of Code of Ethics

The policies evidence the Company's strong emphasis on personal accountability for safety and compliance, which is the basis for my opinion that the Company acted reasonably to investigate

26

further. Of particular note is the Safety Recognition, Rewards, and Consequences Policy. This policy prohibits "[f]alsification of records relating to injuries or safety incidents." Falsification of safety or injury-related records is considered a Category 1 "undesired behavior." Category 1 undesired behaviors, which include "[g]rossly negligent or willful behavior," call for "an immediate termination review." This policy leaves no question that the Company considers falsifying information related to an accident to be a grave offense. (Safety Recognition, Rewards, and Consequences Policy, Section 5.1)

The Company's initial investigation of the accident, and the tracking of Mr. Todd's injury and recovery, was controlled by the Company's mandatory Safety Rules and Incident Reporting Policy. The Safety Rules require supervisors to investigate accidents, injuries and near misses, and to "prepare a written report of [] findings." (U.S. Health & Safety Manual, p.7) The Incident Reporting Policy requires a manager to accompany the injured worker at medical appointments. Two (2) Company representatives, Allister Melvin and Cary Williams, met Mr. Todd at the hospital on May 7. Mr. Melvin accompanied Mr. Todd again to his appointment on May 13.

The worsening of Mr. Todd's symptoms on May 13, the lack of objective medical data to support that change, and the dramatically increased work restrictions – taking Mr. Todd out of work altogether -- triggered the Company's decision to elevate the initial accident investigation to a more thorough investigation of Mr. Todd's condition. Specifically, on May 7, Mr. Todd reported to Dr. Carter symptoms of headache and neck pain. (New Hampshire Workers' Compensation Medical Form, 5/7/13) A CT scan that day was negative. (Access Sports Medicine & Orthopedics, 5/13/13) In contrast, on May 13, Mr. Todd complained to Dr. Shreck of neck pain, headache and difficulty concentrating. (New Hampshire Workers' Compensation Medical Form, 5/7/13) According to Dr. Shreck's report of the May 13 appointment,[11] Mr. Todd also complained of "fatigue, visual changes, weakness, dizziness and headaches," and that "[s]udden movements or driving also exacerbates his symptoms of headache and bilateral neck pain."

The objective medical data available to the Company at the time did not support this change in Mr. Todd's condition. Those tests revealed minimal abnormalities to support Mr. Todd's reported condition. (Access Sports Medicine & Orthopedics, 5/13/13) Mr. Todd's pupils were "equal, round and reactive[,]" his "[e]xtraocular (movements are intact[,]" his "TMS is normal[,]" and there was no "CSF, rhinorrhea or otorrhea." Further, "[c]ranial nerves II through XII are intact[,]" "[t]here is no pronator drift[,]" the results of Romberg testing were normal, and the finger to nose testing was normal. Mr. Todd did have a "slight abnormal nystagmus with right upward gaze." He also made errors on the balance test in tandem stance and one-legged stance.

In the eyes of a person who is not medically trained, like myself and presumably the Company officials who authorized the surveillance, the objective medical information known to the

---

[11] This medical report was not available to the Company at that time it made the decision to further investigate Mr. Todd's report of his injury; however, I found this record useful because it memorializes what Mr. Melvin would have observed at the appointment.

Company at the time does not explain the worsening of Mr. Todd's condition and the resulting increased restrictions.

The Company's concern that Mr. Todd might have been misreporting his symptoms – which were subjective in nature -- is also supported by statements Mr. Todd apparently made at the May 13 appointment, which are documented in the medical record. According to Dr. Shreck's May 13 report, "[Mr. Todd] states now he continues to have difficulty concentrating especially doing light duty work on the computer since his release from the hospital. [...] He also states his headache is slightly improved over the weekends and worse as the workday progresses."

These statements contribute to a reasonable suspicion that Mr. Todd was exaggerating his condition because he preferred to be at home rather than at work on light duty. The reasonableness of this suspicion is corroborated by other information now known to the Company. For example, a May 29, 2013 record from Kevin Heaton, D.O. indicates that Mr. Todd complained that working in the office, answering phones, and looking at the computer bothered him. (Bates 681)

In fact, suspicion that Mr. Todd was not being truthful about his accident-related symptoms obligated the Company to investigate pursuant to the Safety Recognition, Rewards, and Consequences Policy. I note that whether Mr. Todd *actually* falsified his reported condition or acted in a manner that was grossly negligent or willful is not relevant. Instead, for my analysis, the important question is whether it was *reasonable to suspect* that Mr. Todd might have undermined safety or compliance by possibly falsifying accident-related information.

Significantly, supervisors and managers like those who were involved in the initial accident investigation, including Allister Melvin, Technical Services Manager, could be terminated for failing to enforce this policy:

> All supervisors are responsible for both compliance with and enforcement of this policy. Failure to enforce this policy may result in disciplinary action up to and including termination. Every employee is responsible for adherence to this policy. Failure to adhere to this policy may result in disciplinary action up to and including termination.

(Safety Recognition, Rewards, and Consequences Policy, Section 5.1) The Company clearly puts the onus on supervisors and managers to assist the Company in discharging its duty to provide a safe workplace. The Principles of Safety Excellence in the Employee Handbook state, "All incidents are preventable" and, further, "[m]anagement is responsible for preventing incidents." (Employee Handbook, p. 44) Likewise, the Code of Ethics provides that operational managers have an affirmative duty to comply with health and safety rules, assess hazards, and "prevent any employee or contractor from undertaking a task unless it can be completed safety." (U.S. Health & Safety Manual, p. 4)

Thus, in view of the significant role safety plays in the Company's operations, the Company's investigation policies mandated the expanded investigation. As mentioned previously, the Company's mandatory Safety Rules require supervisors to investigate accidents, injuries and

near misses, and to report findings. (U.S. Health & Safety Manual, p.7) The Safety Rules are supplemented by the Incident Reporting Policy, which reiterates the Company's emphasis on prevention: "The purpose of this Policy is to establish requirements for conducting a thorough accident investigation so that the information can be utilized in the prevention of a reoccurrence of the same or similar accidents." (U.S. Health & Safety manual, p. 27)

Further investigation was mandated because the efficacy of these policies in remediating unsafe behaviors and preventing reoccurrences depends entirely on the accuracy and truthfulness of information employees provide about accidents. The people involved in investigating the May 7 accident were obligated to ensure that the information upon which they relied was true. This included Mr. Todd's account of his medical condition.

Further, the Company's Safety Problem Solving policy, which applies to investigating and remediating safety hazards, mandates that all employees – especially supervisors – ensure that co-workers are not "engag[ing] in unsafe behavior." (U.S. Health & Safety Manual, p. 6) The Safety Problem Solving policy states that employees with "any" supervisory authority "have been instructed to take corrective action or contact someone who can when a safety concern is raised." Any inaccuracy or deliberate falsehood in an accident or injury report raises a "safety concern." Therefore, the people involved in investigating the May 7 accident had a responsibility to determine whether Mr. Todd's reports were truthful.

Finally, once suspicion was raised about the truthfulness of Mr. Todd's reports, implicating the Safety Recognition, Rewards, and Consequences Policy, the Company's complaint investigation policy was triggered. That policy explains that all complaints about potential misconduct will be investigated. The Policy specifically states that the Company may choose to use outside investigators, which is exactly what happened here. (Employee Handbook, p. 8)

In sum, the decision to further investigate the truthfulness of Mr. Todd's reported condition was mandated by Company policies. Those policies put Mr. Todd on notice that all accident and injury-related information would be thoroughly investigated. Rather than simply disciplining Mr. Todd based on a suspicion that he was not being truthful -- which would have been the wrong thing to do -- the Company was diligent and careful to gather and analyze evidence before taking any adverse action. As discussed below, the Company followed industry standards and best practices in the investigation process.

> ## 2.   The Company Conducted the Investigation in Accordance with Best Practices

Every investigation begins with the decision to investigate. That decision must be a fair one and should not be motivated by any improper motive or reason. Best practices dictate that, when considering whether to conduct an investigation, the employer should start by determining whether its policies authorize or mandate an investigation. It is also important to consider the seriousness and implications of the complaint or suspected wrongdoing. These factors may tip the scale when policies authorize, but do not mandate, an investigation.

Once the decision to investigate has been made, the employer must take care to ensure that the investigation is conducted in an equitable and even-handed manner. An appropriate investigator should be chosen, that is, one with the skill, knowledge and experience to do the investigation correctly. The investigation should be planned before it starts. To the extent possible, confidentiality should be maintained. Evidence should be carefully gathered and documented. Before any adverse decision is made, the employer must carefully evaluate the evidence, making credibility determinations when necessary. Appropriate action should be taken based on the results of the investigation, and the employer should follow up with the involved party(ies) as appropriate.

In my own experience with workers' compensation cases from my time at Devine Millimet in New Hampshire,[12] surveillance and monitoring of worker's compensation recipients is commonplace. My experience is fairly typical. According to an interview of Stephen Kelly, Scope Investigations, as part of the National Workers' Compensation & Occupational Medicine Conference, surveillance is not at all unusual. "We do countless surveillances in the course of a year." *How to Use Surveillance in Workers' Compensation Cases*, Aug. 13, 2014 (http://workerscompensationconference.com) Mr. Kelly's examples of surveillance illustrate why surveillance is important in this context and frequently used. He gave one example of surveillance of a workers' compensation claimant who was out of work with a back injury. He explained that the surveillance took place during a "snowstorm, guy out with a bad back. We show up at his house. He comes out with his 16 or 17 year old son and they take off walking up the street. They went to about ten different homes and shoveled snow – driveways, the whole nine yards, just shoveling snow with a shovel, not a snow blower or anything else, shovel, him and his son. Again, another one of those situations where they shouldn't be out working and they were."

In this case, Aggregate Industries' decision to conduct surveillance of Mr. Todd was in line with best practices. First, as discussed in detail above, the Company's investigation policy mandated a thorough investigation. Second, as the policies discussed above illustrate, the possibility that Mr. Todd falsified information related to his injury or the accident is extremely serious. The implications of falsification are grave because the Company's legal compliance depends on truthful and complete reporting by employees. For these reasons, the facts reveal that the Company conducted the investigation in good faith.

The investigation planning involved input from several safety representatives from the Company: Justin Kratochvil, Regional Occupational Health & Safety Manager, Jeff Ciampa, Operations Manager, Kellie O'Halloran, Safety Coordinator, Cary Williams, Health and Safety Professional, and Tammie Pierce, Gallagher Bassett Senior Claims Adjuster. (Defendant's First Supplemental Responses and Objections to Plaintiff's Second Set of Interrogatories and Requests for Product of Documents, #2). Based on the roles of the people involved in this decision, it is apparent that the Company viewed the matter as a safety issue. I understand that the Company does not conduct surveillance without the involvement of the General Manager, Mr. Knight. The Company complied with this practice here; surveillance was not conducted

---

[12] I drafted all worker's compensation briefs filed with the New Hampshire Supreme Court for the Honorable Richard Galway for some period of time.

until Mr. Knight was briefed and agreed that surveillance was warranted. (Defendant's First Supplemental Responses to Plaintiff's Second Set of Interrogatories, #2).

The Company chose an outside investigator, SRC Investigations, which was appropriate given the sensitive nature of the surveillance. (Defendant's First Supplemental Responses and Objections to Plaintiff's Second Set of Interrogatories and Requests for Product of Documents, #2). Video recording should be done so as not to unduly invade the privacy of the subject. Retention of professionals here was in order. Continued surveillance was justified when the investigator observed behaviors that the Company reasonably concluded were inconsistent with medical orders.

The investigation was documented by video surveillance. The use of video surveillance allowed the Company to capture Mr. Todd's exact behavior. As such, the Company was able to reach a reliable conclusion without concern about witness credibility. The Company carefully gathered evidence and, as discussed below in relation to the termination decision, carefully vetted that evidence before reaching any conclusion.

> B. *The Company Acted Reasonably and in Accordance with Company Policy and Best Practices When It Terminated Mr. Todd's Employment after Surveillance Revealed that Mr. Todd Repeatedly Failed to Comply with Medical Advice, Compromising His Recovery and Acting Contrary to the Company's Business Interests*

Ultimately, it was revealed that Mr. Todd's injury was legitimate; however, the information gathered from surveillance led the Company to conclude that Mr. Todd deliberately acted in a way that was contrary to the Company's legitimate interest in safety and compliance. It is my opinion that the decision to terminate Mr. Todd's employment was justified by a reasonable application of Company policy, and that the Company complied with best practices in reaching that termination decision.

A safe workplace is essential for maintaining workforce morale and staying competitive. Further, businesses may face significant penalties for noncompliance with OSHA and other workplace safety rules. An employer's responsibility to provide a hazard-free workplace, and to abide by OSHA requirements, includes identifying and correcting health and safety problems. Prevention is crucial.

An employer is responsible for developing and communicating workplace policies that foster compliance with its legal obligations and in accordance with industry standards. Clearly communicated policies play a critical role in legal compliance by establishing expectations for employee behavior. When an employer sets forth clear expectations – in writing, verbally and through the managers' actions – the employer can reasonably expect the workforce to differentiate between acceptable and unacceptable behavior.

Policies are created to establish expectations and to provide guidance for employers on how to consistently handle workplace situations. Although most policies are not all-encompassing, they

provide direction on behavioral expectations. Further, they are a communication tool to help employers maintain order and ensure that managers treat people fairly and consistently.

While an employer should ensure that its expectations are reasonable and clearly conveyed, an employer is not obligated to reduce to writing every act it forbids or expects of its employees. It is reasonable for an employer to expect employees to comply with the spirit and intent of clearly conveyed, reasonable expectations related to employment. It is also reasonable for an employer to hold employees accountable for any off-duty behavior that deliberately violates a clearly-established expectation designed to protect the Company's business.

> ### 1. The Decision to Terminate Was Justified and Consistent with Company Policy

Based on the information gathered in its investigation, the Company was reasonable to conclude that Mr. Todd's actions were contrary to clear medical orders and that he was engaging in physical activity despite having been warned that movements could worsen his condition. Company policies and training clearly communicate the expectation that employees will avoid dishonest, unethical or unsafe behaviors that could impact safety on the job and jeopardize compliance initiatives. Mr. Todd's apparent failure to heed medical orders was contrary to this expectation, and termination was authorized by policy.

> #### (a) Mr. Todd's Actions Were Contrary to Clear Medical Orders

The Company's decision that Mr. Todd acted contrary to medical orders was based on a contradiction in Mr. Todd's behaviors observed by an investigator conducting surveillance as well as the May 13 medical record. (Responses to First Set of Interrogatories, #5) The Company understood that Dr. Shreck "prescribed [Mr. Todd] five days bed rest with zero stimulation (no television, computers, driving, or exercise)."[13] (Safety Investigative Report, Bates 640) Mr. Melvin avers that Dr. Shreck told Mr. Todd "to do nothing but rest, stay in a dim lit room, and [...] have no physical activity or mental straining." (Melvin Affidavit, ¶11)

The Company's understanding of this medical advice appears reasonable and in line with what was communicated to Mr. Todd. The ACE Care Plan, which was given to Mr. Todd on May 13, highlights that "rest is the key" and that Mr. Todd, as a person with a concussion, should pay "careful attention" to "prevent further injury." Mr. Todd was warned not to participate in high-risk activities, which include sports and riding a bike, and to "limit physical activity." In the section entitled "Gradual Return to Play Plan," Mr. Todd was directed, in the first instruction, to engage in "no physical activity." Further, a one-page record from Access Sports Medicine dated May 13 states that rest and sleep will make Mr. Todd's condition better, and movements, among other things, would worsen it.

Mr. Todd was instructed to take five (5) days of bed rest. Surveillance revealed that he ignored this instruction. Though Mr. Todd was instructed not to drive, he was seen driving on May 16.

---

[13] I understand that Mr. Williams began preparing this report on the day of the injury, May 7. It is apparent that it was completed by May 20, 2013, based on its contents.

Though he was instructed to engage in no physical activity, on May 16 he was seen lifting and carrying a high-powered heavy-duty pressure washer. He visited at least four (4) stores that day. And, though he was instructed to stay in a "dim lit room," he was out and about in the bright sunlight on numerous occasions, including on May 17, when he visited at least four (4) more stores. He was observed bending and lifting a large bag of grass seed and other items. When I watched the video, I noted that he carried a large plastic bag to the garage. He appeared to struggle with it; the bag appeared heavy.

Mr. Todd was instructed that "rest is the key," but he was clearly not resting. In fact, Mr. Todd's activities appear contrary to even the lesser restrictions he was given on May 7, when he was instructed not to lift or carry more than 5 or 10 lbs., not to bend, kneel, squat, or climb, and to only occasionally stand, walk and reach.

On May 18, Mr. Todd was even more active. Again, contrary to the instruction that he stay in a "dim lit room," Mr. Todd was outside in the bright sun for four (4) hours that day. Although he was warned not to participate in high-risk activities, which include sports and riding a bike, he was seen using a lug wrench to remove tires, rolling tires, using a portable floor jack, pulling a trailer, as well as squatting, laying and bending. He was seen stepping on a vehicle with one leg several times and lightly jumping.

Despite the frequent up and down movements, one legged stepping on a vehicle and light jumping he was observed doing on May 18, at his medical appointment on May 20, Mr. Todd complained for the first time about "balance issues." He was released to work on modified duty, where he was permitted to work four (4) hours per day. His ability to lift was restricted to ten (10) pounds. His ability to move was restricted; specifically, he was instructed to bend, kneel, squat, climb or drive only occasionally.

Despite the newly reported balance issues, I observed Mr. Todd bending forward frequently in the May 27 video surveillance, including to move potted plants or flowers and to attach jumper cables to the Maxima.

In sum, Mr. Todd's actions, caught on camera, clearly show that he was not complying with medical orders, as reasonably interpreted. This was contrary to the Company's interests in returning him to work at full capacity, at his earliest opportunity, and its interest in having employees who make good safety decisions. As discussed below, Mr. Todd was well aware of these expectations.

(b)  Company Policies and Training Clearly Communicate the Expectation that Employees will Avoid Dishonest, Unethical or Unsafe Behaviors that Could Impact Safety on the Job

Aggregate Industries' policies and training clearly communicate the Company's expectation that employees will avoid any behavior that could compromise their safety or the safety of others at work. Policies also set the expectation that employees will act with integrity and avoid behaviors that are contrary to the Company's business. The Company trains employees that their

participation in safety and compliance is critical to the success of those programs and, further, that the success of the safety and compliance programs is critical to the overall success of the Company's business. And, the policies clearly state that failure to comply with the Company's expectations will not be tolerated.

The theme of risk reduction through good judgment is introduced in the Company's Code of Ethics, issued by the Compliance Department. (Bates 471-477) According to the Handbook, the Code of Ethics is intended as "guidance regarding business ethics, conflicts of interest, and *appropriate standards of conduct that underlie your responsibilities as an employee.*" (Employee Handbook, p. 4) (Emphasis added) Employees are instructed to act with "honesty, integrity, truthfulness and honor." They must avoid impropriety and the appearance of impropriety. Supervisors are responsible for the actions of their employees, and violations of the Code can lead to termination.

Further, the Company requires employees, guided by "good judgment" as expressed in the Code of Ethics, to be personally accountable for assisting the Company to identify and correct health and safety problems. The Principles of Safety Excellence state, "Involvement by all employees is essential." (Employee Handbook, p. 44).

The Employee Handbook acknowledges the principle that no company can anticipate every possible form of misconduct and, therefore, employees are directed to adhere to the "letter, spirit, and intent of all relevant laws and to refrain from any illegal, dishonest, or unethical conduct." (Employee Handbook, 4) The Company sets a reasonable, common sense expectation: "The use of good judgment, based on high ethical principles, will guide you with respect to lines of acceptable conduct." (Employee Handbook, 4)

The Company highlights the importance of "good judgment" in its comprehensive training, such as the Compliance Training that Mr. Todd attended on May 30, 2012. (Compliance Training Acknowledgement on May 30, 2012) As the Company states in the training PowerPoint,[14] "Our decisions and actions define us." (May 31, 2012 Quality Control Compliance Training, p. 3) Employees are urged to ask, "Are my actions and decisions helping to move our Company forward? -or- Do my actions and decisions have us headed in the wrong direction?" (May 31, 2012 Quality Control Compliance Training, p. 5) Employees are trained to, "[d]o the right thing even when no one else is looking." (May 31, 2012 Quality Control Compliance Training, p. 10)

Further, in these materials, the Company encourages employees to report safety or compliance concerns. Slides juxtapose perception with reality in a variety of circumstances, for example, reporting a compliance issue involving a manager or co-worker. (May 31, 2012 Quality Control Compliance Training, p. 13) The perception that this type of reporting will lead to retaliation or indifference is countered by the reality that, "It is the right thing to do," "The law and company policy," and "Company has made improvements based on issues reported by employees."

---

[14] "I understand that the training took place over two days, May 30 and 31. Mr. Todd, as evidenced by the sign-in sheet, attended the training on May 30th. The PowerPoint materials that the Company produced were dated May 31, but I am told an identical presentation took place the day before.

The theme of risk reduction through good judgment is reiterated throughout the Company's handbook, policies and training materials. Indeed, I counted the phrase *"Working safely is a condition of employment"* repeated at least five (5) times in Company policies, including in the Acknowledgement of Receipt of the U.S. Health and Safety Manual that employees are expected to sign. That Acknowledgement states, "By signing below, I acknowledge that working safely is a condition of my employment, and I agree to read and comply with the policies, procedures and rules set forth in this Health & Safety Manual." (U.S. Health & Safety Manual, Acknowledgement of Receipt).

Like the Compliance training materials I reviewed, the Company's safety training materials emphasize that each individual employee is responsible for the safety of all. The Company provides safety training on the nuts and bolts of safety in the field, as well as training on the impact of safety on the bottom line. See e.g. "Safety Working On and Around Machinery" (Bates 595), "OH&S 2013 Aggregate Industries Safety Start-up" (Bates 547) In May 2013, Mr. Todd participated in the Safety Start-up training, which focused on the Company's overall safety efforts and the cumulative impact of individual safety decisions on those efforts. The presentation provided data on lost time for injuries in 2010, 2011 and 2012. (Bates 550) Injury rates, severity and lost time are compared across divisions. (Bates 000551-000562) Injuries are broken down by type. (Bates 000582) This presentation makes the business case that each individual employee's safety compliance has an impact on the bottom line.

These materials and policies all emphasize one fundamental point: the Company expects employees to take personal responsibility for safety, including their personal safety, the safety of co-workers, and the safety of plants and equipment. The materials that I reviewed show that the Company makes it absolutely clear that this expectation encompasses truthful reporting, full disclosure and good judgment. Put another way, the Company's expectation is as follows: "Do the right thing even when no one else is looking."

> (c)   Mr. Todd's Failure to Heed Medical Orders was Contrary to the Company's Clearly Communicated Expectation that He Would Participate in Managing Behaviors that Impact the Company's Safety and Legal Compliance

The fact that Mr. Todd apparently failed to heed medical orders designed to restore him to safe working capacity was contrary to the Company's clearly communicated expectations. Although Mr. Todd's conduct did not occur at work, he engaged in behavior that had the real potential of exacerbating his condition while the Company was paying him to get better. This was dishonest, it impacted his ability to safely do his job, and it was contrary to the Company's business interests.

Mr. Todd's ability and willingness to utilize good safety judgment was essential to his job. As a QC Tech II, he was required to "[a]ctively manage[] risks by ensuring that all related control activities are implemented thoroughly." (Tech QC II Job Description, p. 2) Video showing Mr. Todd ignoring medical instructions was evidence that he was not "actively managing" the risk to his own health and, by extension, the risk to the Company that he would be unable to return to work at full capacity. Once in possession of this information, the Company had a duty to act.

More significant still, the QC Tech II position is a physical job and one in this position frequently supervises and instruct other employees. (Tech QC II Job Description, p. 2) The Company's policies repeatedly state that supervisors have a heightened duty to identify risks and remediate or report them. Video showing Mr. Todd lifting, bending, turning, driving and using tools in the bright sunlight, when he was under medical orders to be "do[ing] nothing but rest, in a dim lit room, and ... hav[ing] no physical activity or mental stimulation[]," supports a reasonable conclusion that he was unable or unwilling to identify risks that impacted the Company. Once in possession of this information, the Company had a duty to act.

In sum, Mr. Todd's actions revealed a failure to use good safety judgment. This impacted the Company's interests. Under these circumstances, the decision to terminate his employment was justified and authorized by Company policies.

> ### 2. The Company Complied with Industry Standards in Conducting the Termination

Sound employment practices call for employees to be disciplined consistently and in accordance with an employer's written policies or procedures. Employees deserve to know and understand what is expected of them in terms of conduct and behavior. Work rules, codes of workplace conduct, and other policies and practices regulating employee conduct should be communicated to and understood by all employees before a company holds them accountable for violations.

Before making the decision to dismiss an employee, it is best practice for an employer to conduct a thorough assessment of the circumstances. First, the employer should ensure that the termination decision is not unlawful based on protected categories, protected activity, public policy, or an express or implied contract. Nor should it be for a retaliatory reason. Next, the employer should carefully examine a number of issues to ensure that dismissal is not contrary to fundamental fairness and industrial due process. In this regard, the employer should consider:

1) Is the decision fair? The employer should act with equity and fairness in making this decision.

2) Has the employee received notice of deficiencies such that the termination would not be a surprise? Ideally, an employer would have written policies, such as those included in an employee handbook, that would set forth workplace standards and performance expectations. If that is not the case, the employer should put the employee on notice of inappropriate conduct or performance deficiencies such that the employee is aware of what can prompt discipline or termination.

3) Has the employee been given an opportunity to tell his or her side of the story and respond to the alleged deficiencies or misconduct? This fact finding is important, as there are often two sides to any story, and the employee usually deserves an opportunity to be heard. This step may be

36

redundant, however, when the facts are not in dispute. Surveillance, in this case, negated the necessity of this step.

4)    Has the employee's personnel record been examined to see his or her history? Oftentimes the employer should understand if the misconduct or poor performance is a pattern or something new. Some misconduct, however, may be so egregious that an employer need not look at the employee's history and termination without prior misconduct may be warranted. That was the case here.

5)    Has the problem been documented? Whether in the form of formal memorandum or corrective action forms or handwritten notes in a file or by e-mail, it is substance over form. The key is documenting, with as much specificity and detail as possible, including dates, times, and examples of where expectations and performance standards have not been met.

6)    Is the termination consistent with how other employees have been treated who have similar performance problems? If not, are there legitimate, articulable reasons for the differing treatments? Oftentimes, an employer cannot do an "apples to apples" comparison. It is easy with a large employer, for example, if someone is terminated for excessive absenteeism. When comparators do exist, an employer must try to ensure consistent treatment, to the greatest extent possible.

7)    Have any written policies, if they exist, been followed? If not, can a legitimate reason for deviating from the policy be identified? While an employer is bound by state and federal law, it also should adhere to any written policies that exist within the organization. An employer should always follow its house rules, both in letter and in spirit, and, if it does not, it must be able to justify the reason for non-adherence.

A termination decision that is not made by one individual, that has been vetted by several managers, and that has legal implications considered is consistent with best practices.

Here, it is my opinion that the Company followed each these steps. First, the Company has in place an important safeguard to ensure that disciplinary decisions impacting safety and compliance are fair. The Safety Recognition, Rewards and Consequences Policy states, "[to] ensure consistency across AIUS, the Corporate Manager of Human Resources, the Corporate Manager of Health Safety & Security and the General Counsel or his designee will participate in these reviews along with the local / functional leadership team."

Although Mr. Todd was not terminated specifically for violating this policy, the Company nevertheless involved a number of senior people from across the Company, including the Human Resources Manager, the Senior Vice President and General Manager, and Senior Vice President. Regional HR Manager Rick Winter gathered the evidence considered by the group. He reviewed

37

the New Hampshire Workers' Compensation Forms, medical records, surveillance video and investigative reports, and firsthand information from Mr. Melvin about the medical advice Mr. Todd received on May 13. When he conferenced with Ted Knight, General Manager, and Graham Hardwick, SVP, Mr. Winter did not provide a recommendation regarding Mr. Todd's employment status; instead, the three gentlemen unanimously agreed that termination was warranted under the circumstances. The decision was then communicated to the Company's in-house legal counsel before a final decision was made and communicated to Mr. Todd.

Second, as discussed above, Mr. Todd was on notice of the Company's expectations.

Third, the events which led to Mr. Todd's termination were not in dispute. The medical information Mr. Melvin conveyed to the Company is fully corroborated by medical records. Mr. Todd's conduct is recorded on video.

With regard to the fourth step, Mr. Todd's personnel file did not reveal similar conduct in the past. However, the Company's policies make it clear that violation of safety, compliance and ethics expectations are terminable offenses. The oft-repeated phrase, "Working safely is a condition of employment" makes this perfectly clear. It only takes one unsafe act on the job to cause death or serious injury. Surveillance revealed that the Company could not have confidence that Mr. Todd would "[d]o the right thing even when no one else is looking[,]" -- even when doing the "right thing" was in his *personal* best interest.

Further, as discussed above, medical records and video surveillance fully document the conduct which led to Mr. Todd's dismissal. With regard to the treatment of other employees who engaged in conduct similar to Mr. Todd's, that is, failure to comply with medical instructions, I am unaware of any comparators. As discussed previously, the Company has taken adverse action when employees have failed to report a workplace injury within 24 hours in order to investigate the reason why the employee failed to promptly report the injury. (Defendant's Response to Plaintiff's First Set of Interrogatories, #10) This shows that accurate and prompt reporting is a priority. It also shows that the Company has a history of taking action when its reporting rules are not followed.

Finally, the Company adhered to its policies by conducting a thorough investigation before making a decision, and by ensuring that the decision was based on Mr. Todd's misconduct rather than any retaliatory or otherwise improper reason.

* **

In conclusion, my examination of the materials provided to me indicates that the Company acted in good faith, based on the information available to it, when it expanded the scope of the accident investigation to include further investigation and surveillance of Mr. Todd. The investigation was conducted in accordance with Company policies and best practices.

The decision to terminate Mr. Todd's employment turned on the centrality of safety to the Company's business. The Company communicates to employees that its bottom line is impacted by each employee's safety decisions. The Company also communicates that employees have a

personal responsibility to use good judgment and manage risks that impact the Company's business. And, the Company makes it clear that it will take action against any employee who fails to meet those expectations. Thus, the decision to terminate Mr. Todd's employment based on the information gathered from surveillance was justified by Company polices, and the Company went about making that decision in accord with best practices.

Please let me know if I can provide additional information to you.

Very truly yours,

Julie A. Moore, Esquire, SPHR, SHRM-SCP

39