UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Garrison Todd

      v.                           Civil No. 14-cv-393-JL
                                      Opinion No. 2015 DNH 199
Aggregate Industries -
Northeast Region, Inc.

**MEMORANDUM ORDER**

As is frequently the case, this wrongful termination action turns on an employer's motivation for firing an at-will employee. In a variation on that theme, it also implicates the interplay between New Hampshire's wrongful termination cause of action and the breach of the covenant of good faith and fair dealing. Plaintiff Garrison Todd sued his former employer, Aggregate Industries - Northeast Region, Inc., alleging that Aggregate wrongfully terminated him for filing a worker's compensation claim. He seeks recovery under claims for both wrongful termination (Count I) and breach of the aforementioned covenant (Count II). This court has jurisdiction pursuant to 28 U.S.C. § 1332(a) (diversity) because Todd is a citizen of New Hampshire, Aggregate is a Massachusetts corporation with its principal place of business in the Commonwealth, and the amount in controversy exceeds $75,000.

Aggregate has moved for summary judgment on the first count, arguing that it terminated Todd's employment for legitimate business reasons and that Todd cannot demonstrate otherwise.

After reviewing the parties' submissions and hearing oral argument, the court concludes that Aggregate has not carried its burden of showing that it is entitled to judgment as a matter of law on Todd's claim for wrongful termination, and so its motion for summary judgment must be denied.

Aggregate has also moved for judgment on the pleadings on Todd's second count on the theory that, under New Hampshire law, Todd's claim for breach of the covenant of good faith and fair dealing has been subsumed by his wrongful termination cause of action.  To the extent that Todd alleges that the manner in which Aggregate terminated his employment breached the covenant of good faith and fair dealing as it serves to limit discretion in contractual performance, the court grants this motion and grants judgment on the pleadings in Aggregate's favor.  However, while the court tends to agree with Aggregate that New Hampshire law probably does not recognize separate causes of action for wrongful termination and breach of the covenant of good faith and fair dealing on the same facts, it is reluctant to decide as much absent a clear pronouncement from the New Hampshire Supreme Court.  Thus, Aggregate's motion for judgment on the pleadings is denied as to that issue, albeit without prejudice to revisiting it before charging the jury.

I.   <u>**Applicable legal standards**</u>

When evaluating a motion for judgment on the pleadings under Rule 12(c), the court invokes essentially the same standard as a motion to dismiss under Rule 12(b)(6).  <u>See</u> Simmons v. Galvin, 575 F.3d 24, 30 (1st Cir. 2009).  For plaintiff's complaint to survive such a motion, he must allege facts sufficient to "state a claim to relief" by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

Summary judgment, on the other hand, is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial. See Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010) (citing Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009)).  A fact is "material" if it could sway the outcome under applicable law.  Id. (citing Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).

In analyzing a summary judgment motion, the court "views all facts and draws all reasonable inferences in the light most

favorable to the non-moving party." Id.  Similarly, in ruling on a motion for judgment on the pleadings, the court must accept as true all well-pleaded facts set forth in the complaint and must draw all reasonable inferences in the plaintiff's favor.  See, e.g., Martino v. Forward Air, Inc., 609 F.3d 1, 2 (1st Cir. 2010).  In neither case need the court credit conclusory allegations or speculation.  See Meuser, 564 F.3d at 515; Sea Shore Corp. v. Sullivan, 158 F.3d 51, 54 (1st Cir. 1998).

## II.  **Background**

The following factual summary adopts the approach outlined above.  All inferences are drawn in Todd's favor, as the plaintiff and non-moving party.

Todd worked for Aggregate and its predecessor for 15 years. On May 7, 2013, while checking the quality of a load of concrete mix at the Portsmouth Naval Shipyard, the chute of the concrete truck struck Todd in the head.  He reported the injury to his superiors.  An ambulance took him to the emergency room, where he was met by Allister Melvin, Aggregate's Technical Services Manager, and Cary Williams, one of Aggregate's Health and Safety officers.  There, Dr. William Carter acknowledged his reported headache and neck pain, diagnosed him with a closed head injury and cervical strain, and cleared him to return to work as long as he was given light duty for the next two days.

4

After two days of desk work at Aggregate's office in Raymond, New Hampshire, Todd told Melvin that he still felt neck stiffness and had pain.  Melvin encouraged him, and he agreed, that he would continue on restricted duty the next day (Friday) and reevaluate his condition after the weekend.  Still not feeling better on Monday, Todd asked for a second doctor visit, which Aggregate arranged with Dr. Geoffrey Shreck at Access Sports Medicine & Orthopedics.  Melvin accompanied Todd to the appointment.  Dr. Shreck noted Todd's complaints of "[n]eck stress & headache; difficulty concentrating" and, like Dr. Carter, diagnosed him with a concussion and cervical strain. Though the parties dispute the extent of Dr. Shreck's instructions, he at least prescribed a week of rest without heavy activity, using the computer, or watching television, as well as fish oil, painkillers, and hot and cold packs.  Dr. Shreck gave Todd a copy of a Worker's Compensation Medical Form.  Melvin also forwarded a copy of that form to Williams.

On Dr. Shreck's orders, Todd did not return to work during the week of May 13 through May 17, 2013.  He also rested without using the computer or watching television.  By his own admission, Todd felt a little better that week and so did some work around the house and yard, carried a power washer, rotated the tires on his jeep, checked the lug nuts on the rear tire of his wife's

5

car, and pulled a trailer from behind his garage to the front of the house.  Allegedly concerned by the lack of any "apparent explanation for the significant degrading of [his] medical condition" requiring Todd to stay home from work that week, Aggregate's third-party administrator for workers' compensation, Gallagher Bassett Services, hired a private surveillance company to surveil Todd on Aggregate's behalf.  Aggregate's private investigator observed Todd engaging in these activities and submitted a report to Aggregate.

Todd attended a follow-up appointment with Dr. Shreck on Monday, May 20, and again complained of neck soreness.  Dr. Shreck again prescribed painkillers, fish oil, ice, and hot packs.  He cleared Todd to return to work for four hours a day, five days a week, with "rest as needed if symptoms increase," and the restrictions that he should only occasionally bend, kneel, squat, climb, or drive, should avoid ladders, and should not lift or carry more than 10 pounds.  After this appointment, Todd again returned to Aggregate's Raymond office on restricted duty.  Aggregate continued to investigate Todd, assigning a "nurse case manager" to follow his medical status and continuing surveillance of Todd's activities.

Todd saw Dr. Shreck again on May 28 and Dr. Kevin Heaten, a concussion specialist at the same clinic, the next day.  At those

6

appointments, Todd continued to complain about continuing

headaches, nausea, balance problems, vertigo, and problems

concentrating.

On May 30, 2013, Gallagher Bassett denied Todd's worker's

compensation claim on the grounds that (1) Todd was not an

Aggregate employee[1] and (2) Todd's injury was not caused by his

employment.  Gallagher Basset further explained that

"surveillance video obtained of employee does not depict [Todd]

being disabled[.]"  The next day, Aggregate suspended Todd

pending the outcome of further investigation.  On June 5, 2013,

Todd's physician released him to full-time light work with some

limitations.

Aggregate terminated Todd's employment on June 18, 2013.  In

the termination letter, Aggregate explained:

> Aggregate Industries - Northeast Region, Inc. (the
> "Company") has conducted an investigation of your
> recent Worker's Compensation claim arising out of
> a workplace incident you reported on May 7, 2013.
> The investigation included a review of your
> medical records in addition to continuing video
> surveillance of your post-incident activities.
> The Company has determined that there is a
> significant discrepancy between the medical
> condition you conveyed to your physicians, the
> prescribed medical response to the condition you
> alleged, and your physical condition observed
> under surveillance.  As a result of these

---

[1]At oral argument, the parties agreed that this was an
error.  At the time of his injury, Todd was an Aggregate
employee.

> findings, the Company has determined to terminate
> your employment effective June 3, 2013 . . . .

A few days later, on June 17, Dr. Heaton saw Todd again and
released Todd back to full-time work with only some bending and
climbing restrictions.

Todd appealed the denial of his worker's compensation claim.
In connection with that appeal, an independent medical examiner,
Dr. George Neal, examined Todd and his medical records at
Gallagher Bassett's request and concluded that Todd's injuries
and symptoms were reasonably attributable to his work injury.
Dr. Neal further confirmed that, at the time of his examination,
Todd's symptoms were "entirely resolved" and "not expected to
recur."  Over Aggregate's objection, the New Hampshire Department
of Labor awarded Todd his workers' compensation benefits.  Todd
then sought reinstatement, which Aggregate denied, prompting Todd
to sue Aggregate for wrongful termination and breach of the
covenant of good faith and fair dealing.  Aggregate removed the
case to this court.

## III. **Analysis**

### A.   **Count I – Wrongful termination**

To prevail on a wrongful termination claim in New Hampshire,
"a plaintiff must establish two elements:  one, that the employer
terminated the employment out of bad faith, malice, or

8

retaliation; and, two, that the employment was terminated because
the employee performed acts which public policy would encourage
or refused to perform acts which public policy would condemn."
Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 44 (1st Cir.
2001) (quotation marks, bracketing, and ellipses omitted).

While Aggregate argues that it is entitled to summary
judgment on Todd's wrongful termination claim because he cannot
demonstrate a genuine issue of material fact as to either
element, the main thrust of Aggregate's challenge is that Todd
will not be able to demonstrate that Aggregate fired Todd <u>because</u>
he filed for worker's compensation.  The court is particularly
mindful that "summary judgment procedures should be used
sparingly in cases where a disputed issue exists concerning
motive or intent" because, in such cases, "issues of credibility
take on special importance."  Bourque v. Town of Bow, 736 F.
Supp. 398, 403 (D.N.H. 1990) (denying motion for summary judgment
on claim of wrongful discharge).  With this principle in mind,
and for the reasons explained below, the court concludes that
Aggregate has not established its entitlement to judgment as a
matter of law on Todd's claim for wrongful termination.

### 1.  Bad faith or malice

To prevail on his wrongful termination claim, Todd must
first demonstrate that Aggregate terminated him in bad faith,

malice, or retaliation.  Straughn, 250 F.3d at 44.  Aggregate

contends that Todd cannot do this because it fired him for a

legitimate business reason, which is legally permissible.  See

Antonis v. Elecs. for Imaging, Inc., 2008 DNH 204, 7-8

(collecting cases).  With Aggregate's stated reason for his

termination in hand, however, Todd may establish bad faith or

malice on Aggregate's part by demonstrating that "the record does

not support the stated reason for the discharge . . . ."

Straughn, 250 F.3d at 44 (citing Cloutier v. Great Atlantic &

Pacific Tea Co., Inc., 121 N.H. 915 at 921-22 (1981)).  Bad faith

or malice may also "be discerned from a course of events

surrounding an employee's discharge, demonstrating a causal link

between the dismissal and improper motive."  Antonis, 2008 DNH

204, 7 (internal citations omitted).

Aggregate contends that it terminated Todd "for the reasons

stated in the termination letter.  There was a significant

discrepancy between the medical condition [he] conveyed to [his]

physicians, the prescribed medical response to the condition [he]

alleged, and [his] physical condition observed under

surveillance."[2]  Winter Aff't Ex. 19 (document no. 18-22); see

---

[2]After reviewing the parties' briefing and hearing oral
argument, the court is still uncertain what exactly Aggregate
meant by this statement.  This also weighs against summary
judgment here.  Notably, at oral argument, Aggregate's counsel
repeatedly represented that Todd was terminated "because of the

also Winter Aff't (document no. 18-3) at ¶ 46.  Having offered

this as its motivation for Todd's termination, Aggregate contends

that Todd cannot sustain his burden of demonstrating "specific

facts showing that there is a genuine issue for trial" as to that

motivation.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

To the contrary, the court concludes that Todd has raised a

genuine issue of fact on this issue by submitting evidence that,

when considered in the light most favorable to him, suggests that

Aggregate's stated reason for his termination, lacking support in

the record, served as a pretext for avoiding a workers'

compensation claim.

### a.    Temporal proximity

First, the swift succession of events leading to Todd's

discharge and their temporal proximity to his filing of a

worker's compensation claim may allow a reasonable jury to infer

bad faith or retaliation on Aggregate's part.  See Harrington v.

Aggregate Indus. Northeast Region, Inc., 668 F.3d 25, 32 (1st

Cir. 2012) ("a reasonable factfinder could focus on the close

temporal proximity between" the plaintiff's protected activity

---

surveillance video."  This reason may or may not be consistent
with the termination letter, which was not unambiguous, depending
on one's interpretation thereof.  As discussed below, see Part
III.A.i.b, infra, even were that the reason for Todd's
termination, he has submitted evidence sufficient to defeat a bid
for summary judgment on the question of Aggregate's motivation.

and his termination and infer retaliation).  Todd claims, first,
that Melvin dissuaded him from visiting a doctor when Todd still
felt ill two days after his May 7 injury.[3]  When Todd finally did
see Dr. Shreck on May 13, he was taken out of work for one week,
which resulted in the filing of his worker's compensation claim.
Then, less than three days later, Aggregate's worker's
compensation administrator hired an investigator and put Todd
under surveillance.  Two weeks after the surveillance began,
Aggregate suspended Todd on May 31, and terminated him two weeks
later, on June 18.

Aggregate contends that it put Todd under surveillance at
that time, not because of his worker's compensation claim, but
because of the "significant degrading of [his] medical condition
from May 7, 2013, (restricted duty) to May 13, 2013, (LTI) when
Mr. Todd was taken out of work entirely and ordered just to rest"
with "no apparent explanation."  Affidavit of Rick Winter
(document no. 18-3) at ¶ 27.  Though the parties spill a great
deal of ink on the subject, it is Aggregate's motivation for

_____

[3]Todd also faults Aggregate for sending him to its chosen
clinic and failing to inform him of his right to select his own
doctor.  Obj. to Mot. for Summary Judgment (document no. 24-1) at
3.  But as Todd's counsel acknowledged at oral argument,
Aggregate was under no obligation to so inform Todd.  Nor has
Todd offered any evidence -- beyond speculation -- that he would
have sought the opinion of a different doctor.  Ordinarily,
conclusory allegations cannot establish a dispute of material
fact, and do not do so here.  See Meuser, 564 F.3d at 515.

terminating Todd's employment, not its reason for putting him under surveillance, that matters most here.  Under the specific circumstances present in this case, the temporal proximity of the surveillance to the worker's compensation claim and Todd's subsequent termination raises a question as to whether Aggregate's stated motivation for Todd's termination was pretextual.  As explained supra, such questions of motivation are best reserved for the jury.  See Bourque, 736 F. Supp. at 403. The temporal proximity of events, therefore, favors a denial of summary judgment.

> **b.    Aggregate's stated reason for Todd's termination**

As observed supra, a plaintiff may demonstrate that his employer acted in bad faith through showing that the record does not support the employer's stated reason for terminating him. See Cloutier v. Great Atlantic & Pac. Tea Co., Inc., 121 N.H. 915 (1981).  Here, Todd has suggested several ways in which the evidence appears to undercut Aggregate's stated reason for his termination -- that is, the "significant discrepancy between the medical condition [he] conveyed to [his] physicians, the prescribed medical response to the condition [he] alleged, and [his] physical condition observed under surveillance."

First, Todd has introduced evidence demonstrating a dispute as to just what was "the prescribed medical response to [Todd's]

13

condition."  Aggregate argues that Dr. Shreck told Todd to do
nothing for the following week except "rest, stay in a dim lit
room, and . . . have no physical activity or mental straining."[4]
Mot. for Summary Judgment (document no. 18-2) at 6.  Todd, on the
other hand, recalls that Dr. Shreck merely told him to go home
and rest with no heavy activity, prescribing no specific
restrictions or weight limitations beyond that Todd should avoid
using the computer or watching television.  Todd Aff't (document
no. 24-5) at ¶ 10.  Todd's account is supported by Dr. Shreck's
notes from Todd's May 13 appointment, in which Dr. Shreck
recorded that Todd "was given . . . an ACE care plan for
concussion with described symptoms and reinforced recommendations
that he just rest with no watching TV in the dark and no mental
or physical straining such as that involved with computer work."
Reply on Mot. for Summary Judgment Ex. B (document no. 27-2) at
2.  The worker's compensation medical form that Todd received

---

[4]Aggregate relies for this on Melvin's account of Dr.
Shreck's instructions to Todd after his May 13, 2013 appointment.
See Mot. for Summary Judgment (document no. 18-2) at 6.  Todd
objects to the introduction of Melvin's account as inadmissible
hearsay.  See Fed. R. Civ. P. 56(c)(2) ("A party may object that
the material cited to support or dispute a fact cannot be
presented in a form that would be admissible in evidence.").  But
"[a]n order or instruction is, by its nature, neither true nor
false and thus cannot be offered for its truth."  United States
v. Shepherd, 739 F.2d 510, 514 (10th Cir. 1984).  Because
Aggregate offer's Melvin's account of Dr. Shreck's instructions
to "show that they occurred rather than to prove the truth of
something asserted," it is not hearsay.  Id.

from Dr. Shreck after his appointment can also be read to support his version of events, indicating only that Todd was to "rest," without any specific physical restrictions beyond a reference to the ACE care plan.  See Obj. to Mot. for Summary Judgment Ex. 6 (document no. 24-1).

At oral argument, the parties also hotly disputed the proper interpretation of the ACE care plan, Reply on Mot. for Summary Judgment Ex. C (document no. 27-3), though counsel acknowledged that neither Todd nor Aggregate had a copy of that document at the time of Todd's termination.  Aggregate contended that an underlined "No physical activity" instruction on its second page meant Todd was not to engage in any sort of physical activity prior to his May 20, 2013 follow-up appointment with Dr. Shreck. Todd, on the other hand, argued that he was only to avoid any "physical activity" as defined by the form -- that is, "PE, sports practices, weight-training, running, exercising, heavy lifting, etc."  Id. at 1.  The parties' inability to agree on just what instructions Dr. Shreck gave Todd and what those instructions meant calls into question whether Aggregate could reasonably have believed that Todd acted in contravention of those instructions, and thus undercuts record support for Aggregate's stated reason for Todd's termination.

Second, Todd has also introduced evidence suggesting that a reasonable factfinder could conclude that Todd's condition and activities under surveillance did not contravene those restrictions.  Dr. Heaton, Todd's treating physician, reviewed the surveillance materials and yet opined that he did "not think that [Todd] is malingering."  Obj. to Mot. for Summary Judgment Ex. 7 (document no. 24-8) at 2.  Similarly, Dr. Neal, the independent medical examiner who examined Todd at Gallagher Bassett's request after Gallagher Bassett denied his workers' compensation claim, also reviewed the surveillance materials and concluded that nothing observed in those materials would negate his diagnosis of concussion and cervical strain attributable to Todd's accident at work.[5]  Obj. to Mot. for Summary Judgment Ex. 8 (document no. 24-9) at 4.

In addition to opinions of these two physicians, Todd has also submitted evidence that reasonable finders of fact not only

---

[5]If, as Aggregate's counsel suggested at oral argument, Todd was terminated not for the reasons stated in his termination letter but "because of the surveillance video," these opinions alone may well be sufficient to raise a question of fact as to Aggregate's motivation on the basis that the evidence of record failed to support the stated reason for termination.  Termination "because of the surveillance video" would imply that Aggregate fired Todd because it believed he was feigning the extent of his injury to avoid work -- that is, malingering.  Cf. McGrath v. Consol. Rail Corp., 136 F.3d 838, 840 (1st Cir. 1998).  Through these opinions, which Aggregate has not countered, Todd has introduced evidence sufficient to create a dispute as to whether that was the case here.

could, but have, failed to find any disparity between Todd's
activities under surveillance, his reported medical condition,
and his doctors' prescribed limitations.  Objecting to Todd's
worker's compensation claim, Aggregate argued to the Department
of Labor that Todd violated his doctor's prescription by engaging
in the activities observed by the investigator.  The hearing
officer concluded, however, that "the objective evidence
available to [him] well supported that the claimant had ongoing
difficulties relative to his injury of May 7, 2013, until . . .
on or about July 9, 2013," and that Todd's "residual disability
during the timeframe between May 13 and May 17 [was] appropriate
regardless of the surveillance submitted."  Obj. to Mot. for
Summary Judgment Ex. 23 (document no. 24-24) at 5.  Similarly, in
resolving Aggregate's challenge to Todd's unemployment benefits
claim in Todd's favor, the Department of Employment Security
Appellate Board concluded that Aggregate had not shown that
Todd's behavior under surveillance violated Todd's doctors'
stated restrictions.  Obj. to Mot. for Summary Judgment Ex. 17
(document no. 24-18) at 3-4.  These findings, as Aggregate
correctly observes, have no collateral estoppel effect on this
action.  See N.H. Rev. Stat. Ann. 282-A:180.  This court may,
however -- and does -- rely on them for the proposition that a
finder of fact could reasonably conclude that the record does not

support Aggregate's stated reason for terminating Todd's
employment.[6]

Viewing this record in the light most favorable to Todd
reveals an unresolved question of material fact:  whether
Aggregate fired Todd for the reasons stated in his termination
letter or whether those reasons amount to a pretext, unsupported
by the record, for firing Todd on another basis.  Because a
rational jury could possibly conclude the latter, see Straughn,
250 F.3d at 44, the disputable nature of the record support for
Aggregate's stated reason for terminating Todd's employment
creates a genuine issue of material fact, militating a grant of
summary judgment.

> **c.   Evidence of an alternative motivation for
> Todd's termination**

Having raised a question about whether Aggregate's stated
reason was its motivation for his termination, Todd fills the
ensuing vacuum with the allegation that Aggregate fired him
because he filed a "claim for workers' compensation benefits when
he was taken out of work by his doctors . . . ."  Obj. to Mot.
for Summary Judgment (document no. 24-1) at 4.  While his
evidence in support of this allegation is somewhat thin, it is

---

[6]Regardless of their collateral estoppel shortcomings, the
parties do not dispute the admissibility of these exhibits for
summary judgment purposes.

sufficient to survive Rule 56 scrutiny when coupled with the
evidence above.

In support of his theory, Todd argues that Aggregate seeks
to avoid workers' compensation claims by having its managers
pressure doctors to send injured employees back to work on a
restricted basis.  Id. at 15.  As evidence of this, he offers the
testimony of Rick Winter, Aggregate's human resources manager,
who explained that Aggregate sends a supervisor to the doctor
with an injured employee to make sure that the doctor "release[s]
that injured worker back to work in a job that Aggregate claims
is something that they can do given [their] limitations and
restrictions."  Obj. to Mot. for Summary Judgment Ex. 14
(document no. 24-15) at 56-57.  Todd suggests that Aggregate has
an interest in going to these lengths to avoid workers'
compensation claims because, as Mr. Winter further explained, a
lower number of workers' compensation claims for lost-time
accidents could earn him a safety-related bonus.  Obj. to Mot.
for Summary Judgment (document no. 24-1) at 15-16.

In the abstract, the court is skeptical of this argument,
especially in the absence of evidence that Melvin actually
exerted any such pressure on Drs. Carter or Shreck during the two
visits he attended.  But this testimony, considered in the light
most favorable to Todd, at least permits the inference that

19

Aggregate terminated Todd to avoid a workers' compensation claim, rather than for its stated reason.

Taken together, the temporal proximity of the events leading to Todd's termination and his claim for workers' compensation, evidence demonstrating lack of record support for Aggregate's stated reason for that termination, and evidence offered in support of an alternative motivation on Aggregate's part create genuine issues of fact as to whether Aggregate acted with bad faith or malice in terminating Todd.  As this issue is material to Todd's wrongful termination claim, they preclude summary judgment on this element.

### 2.  Public policy

The second element of wrongful termination requires that "the employment was terminated because the employee performed acts which public policy would encourage or refused to perform acts which public policy would condemn." Straughn, 250 F.3d at 44.  As noted supra, Todd contends that Aggregate fired him for filing a workers' compensation claim.  Aggregate agreed, at oral argument and in its briefing papers, see Mot. for Summary Judgment (document no. 18-2) at 18, that public policy would encourage workers to file for workers' compensation when they are injured on the job.  Cf. Perrotti-Johns v. Wal-Mart Stores, Inc.,

2006 DNH 79, 17.  For the purposes of resolving this motion,
then, the court assumes that it would.

Aggregate takes aim, instead, at Todd's ability to prove the
requisite causal connection between his termination and his
worker's compensation claim in light of Aggregate's stated
reasons for terminating his employment.  In order to find a lack
of any such causal connection, though, the court would have to
accept Aggregate's stated motivation for terminating Todd's
employment.  And, for the reasons discussed <u>supra</u>, Todd has
demonstrated that questions of material fact exist about whether
Aggregate's stated reason for his termination actually reflects
Aggregate's actual motive.

### B.    Count II – Covenant of good faith and fair dealing

By the second count of his complaint, Todd alleges that
Aggregate breached the covenant of good faith and fair dealing.
Aggregate moves for judgment on the pleadings arguing that, under
New Hampshire law, the wrongful termination tort has subsumed
that contract cause of action.  <u>See</u> Mot. for Judgment on
Pleadings (document no. 17-1) at 24.  Todd disputes this reading
of the law.  He further contends that, even if he does not have a
cause of action for breach of the covenant based in the reason
for his termination, Aggregate exceeded the boundaries of
permissible good faith discretion under the circumstances and

21

conditions of his employment there by terminating him in the manner it did.  Obj. to Mot. for Judgment on Pleadings (document no. 20-1) at 5-6.  For the reasons explained below, the court grants the motion in part and denies it in part.

### 1.   Termination of the at-will employment relationship

Wrongful termination, which has admittedly been treated as something of a "hybridization of both contract and tort," Porter v. City of Manchester, 151 N.H. 30, 38 (2004), was first recognized in Monge v. Beebe Rubber Co., 114 N.H. 130, 133 (1974), as an exception to the general rule that an employer or employee can terminate an at-will employment relationship for any reason on the theory that termination of such a relationship "which is motivated by bad faith or malice or based on retaliation" constituted breach of that employment contract.

In narrowing that exception in Howard v. Dorr Woolen Co., the Court recognized that it applied only where the employee was terminated "because he performed an act that public policy would encourage, or refused to do that which public policy would condemn." 120 N.H. 295, 297; Porter, 151 N.H. at 37-38.  But the Court emphasized that, in requiring that element, it "did not create a new rule of law or significantly depart from Monge . . . ." Bergeron v. Travelers Ins. Co., 125 N.H. 107, 108 (1984).

More recently, the New Hampshire Supreme Court held that, while the first element of a wrongful termination claim -- the requirement that the employer not terminate an employee out of bad faith -- arose from contract law, "wrongful termination is a cause of action in tort." Porter, 151 N.H. at 38. As the Court explained:

> Our prior cases have imposed a duty upon the employer that exists independent of the at-will employment contract. Specifically, we have held that an employer may not terminate an employee for performing an act that public policy would encourage, or for refusing to do something that public policy would condemn. Moreover, a wrongful termination action is not designed to protect the employee's interest in having promises performed. Rather, it is designed to protect the employee from the harms that result from a wrongful discharge.

Id. at 39.

It is not unreasonable to conclude from this analysis and the cause of action's history that the New Hampshire Supreme court intended Porter to foreclose a separate wrongful termination cause of action for breach of the implied duty of good faith and fair dealing. Nor would it be the first time that a court in this district has done so. Reviewing the same set of cases, Judge DiClerico similarly concluded that:

> the traditional cause of action for wrongful termination has evolved from its contractual roots and is now treated as a tort. It follows that any claim of a terminated at-will employee based on a contract theory must still be brought under the

23

> rubric of wrongful termination and, as such, must
> satisfy the public policy component of that cause
> of action.

Frechette v. Wal-Mart Stores, Inc., 925 F. Supp. 95, 99 (D.N.H.
1995).

Nor is the court persuaded by Todd's suggestion that J&M
Lumber & Const. Co. v. Smyjunas, 161 N.H. 714 (2011), creates or
perpetuates a cause of action for breach of the covenant of good
faith and fair dealing.  Though the Court there acknowledged that
the "termination of at-will employment agreements" is one of the
"series of doctrines" making up the implied duty of good faith
and fair dealing in New Hampshire's law of contracts, it tied the
good-faith obligation in an at-will employment relationship back
to Monge, 161 N.H. 714, 724 (2011), thus at least implicitly
acknowledging it as the same good-faith obligation as that which
gives rise to a wrongful termination claim.

For these reasons, the court agrees that New Hampshire
appears to recognize wrongful termination, rather than breach of
the covenant of good faith and fair dealing, as the cause of
action through which an at-will employee may challenge his
termination.  And, as noted supra, there is precedent in this
district to support that reading.  See Frechette, 925 F. Supp. at
99.  But the New Hampshire Supreme Court has not expressly ruled
as much, and this court is reluctant to rule that a given cause

24

of action does not exist under New Hampshire law without a clear
legislative or judicial pronouncement from the State of New
Hampshire.[7]  The court therefore denies Aggregate's motion for
judgment on the pleadings without prejudice to revisiting this
issue before charging the jury.

### 2.   Limitation of discretion

New Hampshire recognizes an implied duty of good faith and
fair dealing as a series of three doctrines.  In addition to the
termination of at-will employment contracts, it is implicated in
cases "dealing with standards of conduct in contract formation
. . . and with limits on discretion in contractual performance."
Centronics Corp. v. Genicom Corp., 132 N.H. 133, 140 (1989).  In
his objection to Aggregate's motion for judgment on the pleadings
(though nowhere in his complaint), Todd contends that Aggregate
breached the covenant in its third permutation -- as a limitation
on discretion in performance of the contract -- by the manner in

---

[7]And, in the end, resolving this question has little
practical effect on the litigation of this case.  Todd has not
alleged that, as an at-will employee, Aggregate owed him any
contractual duty with regard to his termination beyond not firing
him in bad faith, malice, or retaliation for doing that which
public policy would encourage or refusing to do that which public
policy would condemn.  Thus, as far as the court can tell under
the facts and circumstances presented here, in order to prevail
on a claim for breach of the implied covenant of good faith and
fair dealing, Todd would have to prove the same facts to prevail
on his wrongful termination claim.

which Aggregate terminated his employment.  Obj. to Mot. for
Judgment on Pleadings (document no. 20-1) at 5-6.  Specifically,
Todd argues, Aggregate acted in bad faith first by subjecting him
to surveillance and then by firing him instead of subjecting him
to some lesser discipline, as required by Aggregate's employee
handbook.  Id.

As this court has previously observed, whether a plaintiff
has sufficiently alleged a breach of this duty turns in part on
"whether [an] agreement allows or confers discretion on the
defendant to deprive the plaintiff of a substantial portion of
the benefit of the agreement." Rouleau v. U.S. Bank, N.A., 2015
DNH 084, 7.  And as Judge Barbadoro has explained, such
"contractual discretion can be exercised in a way that violates
the duty of good faith and fair dealing only if a promise is
subject to such a degree of discretion that its practical benefit
could seemingly be withheld." Milford-Bennington R. Co., Inc. v.
Pan Am Rys., Inc., 2011 DNH 206, 11.

Todd's counsel conceded at oral argument that Todd did not
expressly plead the existence of any contractual duty between
Todd and Aggregate beyond that inherent in the at-will employment
relationship.  The court cannot find so much as the implication
in Todd's complaint -- even when read in the light most favorable
to Todd -- that such an agreement granted Aggregate a level of

discretion that would deprive Todd of its practical benefit or
that, by monitoring Todd's off-duty conduct or foregoing lesser
discipline, Aggregate somehow exercised that discretion
impermissibly.  Rather, Todd grounded his claim for the breach of
the covenant of good faith and fair dealing solely in Aggregate's
alleged retaliatory termination.[8]  Thus, although the court will
permit Todd's wrongful termination-based breach theory to proceed
for the time being, its covenant claim is dismissed under Rule
12(c) to the extent that Todd claims he has alleged a discretion-
based breach.

## IV.  **Conclusion**

For the foregoing reasons, the defendant's motion for
summary judgment[9] is DENIED.  Its motion for judgment on the
pleadings[10] is GRANTED as to Todd's claim for breach of the
covenant of good faith and fair dealing as a limitation on

---

[8]Even had Todd pled this theory, this argument would likely
fail in light of Todd's acknowledgment, Winter Aff't Ex. 2
(document no. 18-4), that Aggregate's employee handbook did not
create a contractual relationship or otherwise alter the at-will
relationship between him and Aggregate.  See Butler v. Walker
Power, Inc., 137 N.H. 432 (1993) (affirming conclusion that
employee handbook did not modify parties' at-will relationship
when employee acknowledged waiver).

[9]Document no. 18.

[10]Document no. 17.

discretion in contractual performance and DENIED without

prejudice as to the rest.

**SO ORDERED.**

_____
Joseph N. LaPlante
United States District Judge

Dated: October 27, 2015

cc:  Mark D. Wiseman, Esq.
     Jeffrey Christensen, Esq.
     Joanne I. Simonelli, Esq.
     Peter Bennett, Esq.